UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:

COMMUNITY HEALTH SOLUTIONS
OF AMERICA, LLC,

Debtor.

_____/

Chapter 11
Case No. 8:06-BK-01215-CPM

## DISCLOSURE STATEMENT WITH
## RESPECT TO PLAN OF REORGANIZATION FOR
## COMMUNITY HEALTH SOLUTIONS OF AMERICA, LLC

John A. Anthony, Esq.
Cheryl Thompson, Esq.
Gray Robinson, PA
201 N. Franklin Street
Suite 2200
Tampa, Florida 33602
(813) 273-5000
(813) 273-5145 (telecopy)
e-mail: janthony@gray-robinson.com
Counsel for Larry S. Hyman, the Chapter 11 Trustee

Jeffrey W. Warren, Esq.
Andrew T. Jenkins, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, Florida 33601-3913
(813) 224-9255
(813) 223-9620 (telecopy)
e-mail: jwarren@bushross.com

and

Thomas A. Lash, Esq.
Damon M. Ellis, Esq.
Saxon Gilmore Carraway Gibbons
Lash & Wilcox, P.A
Suite 600
201 E. Kennedy Blvd.
Tampa, Florida 33602
(813) 314-4500
(813) 314-4555 (telecopy)
e-mail: tlash@saxongilmore.com
Counsel for Mirabilis Ventures, Inc.

Mark J. Bernet, Esq.
Buchanan Ingersoll & Rooney PC
SunTrust Financial Center
401 E. Jackson St.
Suite 2500
Tampa, Florida 33602
(813) 222-8180
(813) 222-8189 (telecopy)
e-mail: mark.bernet@bipc.com
Co-counsel for Common Paymaster
Corporation

## PRELIMINARY STATEMENT

This Disclosure Statement (the "Disclosure Statement") is submitted by Mirabilis Ventures, Inc. ("Mirabilis") and Common Paymaster Corporation ("Paymaster"), and Larry S. Hyman, the Chapter 11 Trustee (the "Chapter 11 Trustee"), all of whom are defined herein as the "Plan Proponents," pursuant to Section 1125 of the Bankruptcy Code in connection with the Plan of Reorganization (the "Plan") for Community Health Solutions of America, LLC ("Community Health Solutions"). A copy of the Plan is attached as Exhibit "A" hereto. For purposes hereof, all capitalized terms used in this Disclosure Statement, and not otherwise separately defined herein, shall have the meanings ascribed to such terms in the Plan, as the Plan may be amended, modified or supplemented from time to time. Such meanings shall be equally applicable to both the singular and plural forms of such terms.

Because this is a small business case under the Bankruptcy Code the Bankruptcy Court has conditionally approved this Disclosure Statement subject to final approval at the Confirmation Hearing when the Bankruptcy Court will make the determination whether to approve this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical reasonable investor typical of the holders of Claims and Interests in the Classes of Claims and Interests entitled to vote pursuant to the Plan to make an informed judgment whether to accept or reject the Plan. **THE CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT AND THE FINAL APPROVAL OF THIS DISCLOSURE STATEMENT DO NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

**NO STATEMENT OR INFORMATION CONCERNING THE DEBTOR (PARTICULARLY AS TO FINANCIAL CONDITION OR WITH RESPECT TO DISTRIBUTIONS TO BE MADE UNDER THE PLAN) OR ANY OF ITS ASSETS THAT IS GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE STATEMENTS AND INFORMATION ABOUT THE DEBTOR AND THE FINANCIAL INFORMATION OF THE DEBTOR, INCLUDING ALL INFORMATION REGARDING CLAIMS OR INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM DOCUMENTS AND INFORMATION PREPARED BY THE DEBTOR OR THE PLAN PROPONENTS OR PROVIDED TO THE PLAN PROPONENTS' PROFESSIONALS BY THE DEBTOR. THE PLAN PROPONENTS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION EXCEPT AS REFERENCED AND EXPRESSLY DISCLAIM ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN INFERENCE THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE**

DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL CONSEQUENCES OR EFFECTS OF THE REORGANIZATION OF THE DEBTOR. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS A FORECAST OF FUTURE EVENTS AND THEREFORE INCLUDES ESTIMATES, ASSUMPTIONS AND PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL CONTROL.

EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT SUCH HOLDER'S ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH HOLDER, INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS OF THE PLAN.

IT IS OF THE UTMOST IMPORTANCE TO THE PLAN PROPONENTS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND FILING IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, SUITE 727, TAMPA, FLORIDA 33602.

## OVERVIEW OF THE PLAN

The following is a brief summary of certain information contained elsewhere in this Disclosure Statement and the Plan. The summary is necessarily incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement and the Exhibits hereto and the Plan.

The Plan is the product of joint efforts by the Plan Proponents and their professionals to design a plan for the Debtor that is fair and equitable to all parties in interest. Consistent with these objectives, the Plan Proponents believe that considering all of the facts and circumstances underlying the Bankruptcy Case, the Plan provides for the maximum recoveries to, and the expeditious and equitable treatment of, holders of all Claims and Interests. **THE PLAN PROPONENTS RECOMMEND A VOTE FOR ACCEPTANCE OF THE PLAN.**

The Plan Proponents believe in the Debtor's ability to successfully reorganize under the terms and conditions of the Plan. Generally, the Plan provides for the payment of Allowed Claims and Allowed Interests in accordance with the requirements of the Bankruptcy Code through New Capital and Supplemental Funding infused into the Debtor by Mirabilis. The Plan provides for, among other things, a distribution of Cash on the Effective Date to satisfy in full

Allowed Administrative Claims. The Plan further provides for the payment in full of Allowed Other Priority Claims and Allowed Small Claims on the Distribution Date and the structured payment over time for certain Allowed Secured Claims. The Plan also provides for the payment in full of Allowed Other Unsecured Claims with an initial distribution of the Distribution Date based upon the remaining available funds and the balance within two (2) years Holders of Subordinated Claims will not receive any distribution under the Plan and such Claims will be discharged as of the Effective Date. The current holders of Interests in the Debtor, including any Interests claimed by Mirabilis, will receive no distribution under the Plan and their membership units will be cancelled. In addition, the Plan proposes a series of compromises and settlements of the Affiliate Issues, that all relate to transactions and business dealings between, among or involving the Debtor, the Plan Proponents, and one or more of the Affiliates.

**THE PLAN PROPONENTS BELIEVE THAT IT IS IN THE BEST INTERESTS OF ALL PARTIES TO VOTE TO ACCEPT THE PLAN BECAUSE THE PLAN FAIRLY AND EQUITABLY TREATS ALL HOLDERS OF CLAIMS AND INTERESTS BY PROVIDING THE EARLIEST POSSIBLE AND MAXIMUM PRACTICAL RECOVERY TO SUCH HOLDERS.**

## ARTICLE 1

### INTRODUCTION

1.1     <u>Purpose of this Disclosure Statement</u>. This Disclosure Statement is submitted, pursuant to Section 1125 of the Bankruptcy Code, to all known holders of Claims against, or Interests in, the Debtor for the purpose of disclosing that information which the Bankruptcy Court has determined is material, important and necessary for holders of Claims and Interests of the Debtor to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan.

1.2     <u>Explanation of the Bankruptcy Case</u>.

(a)     <u>Purpose of Chapter 11</u>. Chapter 11 of the Bankruptcy Code is often called "commercial bankruptcy." Chapter 11 contemplates the formulation of a plan of reorganization or liquidation and outlines how a debtor's debts will be paid. In addition to statutory requirements relating to plan formulation, confirmation and post-confirmation matters, a Chapter 11 case is also shaped by statutory prohibitions against collection efforts or enforcement actions by creditors. The Bankruptcy Code contains a number of other significant provisions applicable to Chapter 11 cases, such as those relating to pre-petition executory contracts, which confer powers on the debtor in possession and also provide creditors with certain rights and remedies.

(b)     <u>Formulation of the Plan</u>. Formulation of a plan of reorganization or liquidation is the principal purpose of a Chapter 11 case. A Chapter 11 plan sets forth the means by which claims against, and interests in, the debtor will be satisfied. After a plan has been filed, it must be accepted by holders of claims against, or interests in, the debtor. Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a Chapter 11 plan. This Disclosure Statement is presented to holders of Claims and Interests to satisfy the disclosure requirements of Section 1125 of the Bankruptcy Code.

1.3    Approval of Disclosure Statement.  By Order of the Bankruptcy Court, this Disclosure Statement was conditionally approved.

1.4    Voting Procedures.

(a)    Persons Entitled to Vote. Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are impaired[1] under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Furthermore, if a Class of Claims or Interests is not entitled to receive any distribution under the Plan, such Class is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Holders of Disputed Claims are not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of such holder, temporarily allows the Claim in an amount which it deems proper for purposes of voting to accept or reject the Plan. Any such motion must be heard and determined by the Bankruptcy Court in accordance with Bankruptcy Rule 3018(a).

(b)    Voting Instructions.

(1)    Ballots. In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. If you have Claims or Interests in more than one Class, you will receive multiple ballots. **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND SHOULD COMPLETE AND RETURN ALL BALLOTS.**

(2)    Returning Ballots. **YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND, IN ORDER FOR IT TO BE COUNTED, FILE IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, 801 NORTH FLORIDA AVENUE, SUITE 727, TAMPA, FLORIDA 33602, ON OR BEFORE OCTOBER 6, 2006.**

---

[1]    Under Section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a Chapter 11 plan unless, with respect to each claim or interest in such class, the plan in question:

(1)  leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2)  notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A)  cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured;

(B)  reinstates the maturity of such claim or interest as such maturity existed before such default;

(C)  compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D)  if such claim or such interest arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E)  does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**IT IS OF THE UTMOST IMPORTANCE TO THE PLAN PROPONENTS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

(c)　　Incomplete or Irregular Ballots. Ballots which fail to designate the Class to which they apply shall be counted, subject only to contrary determinations by the Bankruptcy Court, in the Class determined by the Debtor. **BALLOTS THAT ARE NOT SIGNED AND BALLOTS THAT ARE SIGNED BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

　　1.5　　Confirmation.

(a)　　Confirmation Requirements. Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan for it to be confirmed by the Bankruptcy Court. For any Class of "impaired" Claims to accept the Plan, Section 1126(c) of the Bankruptcy Code requires that claimants who hold a majority in number and two-thirds (2/3) in amount of the Allowed Claims in such Class that actually vote on the Plan must vote to accept the Plan. For a Class of impaired Interests to accept the Plan, Section 1126(d) of the Bankruptcy Code requires that holders of two-thirds (2/3) in amount of the Allowed Interests in such Class that actually vote on the Plan must vote to accept the Plan.

Even if all Classes of Claims and Interests accept the Plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court find, among other things, that the Plan is in the best interests of holders of Claims and Interests. Section 1129 generally requires that the value to be distributed to holders of Claims and Interests may not be less than such parties would receive if the Debtor was to be liquidated under Chapter 7 of the Bankruptcy Code.

(b)　　Cramdown. Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though less than all of the Classes of Claims and Interests accept it. Confirmation of the Plan over the objection of one or more impaired Classes of Claims or Interests is generally referred to as a "cramdown". For the Plan to be confirmed over the objection of an impaired Class of Claims or Interests, the Plan Proponents must show that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. In order to fulfill this requirement with respect to a Class of unsecured claims that has not accepted the Plan, the Plan Proponents must show that (i) the Plan provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date, equal to the Allowed Amount of such Claim or (ii) the holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain any property under the Plan on account of such junior Claim or Interest.

(c)　　Confirmation Hearing. The Bankruptcy Court has set a Confirmation Hearing with respect to the Plan. Each party in interest will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's notice of the hearing on Confirmation of the Plan. The Confirmation Hearing may be adjourned, from time to time, by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

(d)    Feasibility of the Plan.  The terms proposed for the treatment of Allowed Claims and Allowed Interests under the Plan are based upon, among other things, the assessment by the Plan Proponents of the relative priority afforded to various Claims and Interests under the Bankruptcy Code and the Debtor's ability to repay each of the obligations.  **THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES FOR THE GREATEST AND EARLIEST RECOVERIES FOR ALL HOLDERS OF CLAIMS AND INTERESTS.**

(e)    Effect of Confirmation.  Confirmation makes the Plan binding upon the Debtor, all holders of Claims and Interests and other parties in interest, regardless of whether or not the Plan has been accepted by them.

1.6    Procedure for Filing Proofs of Claim and Proofs of Interest.

(a)    Bar Dates.

(1)    General Bar Date for Claims.  Unless otherwise ordered by the Bankruptcy Court, all Proofs of Claim of a non-Governmental Unit must have been filed by June 5, 2006 (the "General Claims Bar Date").  **IF A CLAIM WAS LISTED IN THE SCHEDULES AS NON-CONTINGENT, LIQUIDATED AND UNDISPUTED, A PROOF OF CLAIM NEED NOT HAVE BEEN FILED.**  Both the Schedules and the docket listing Proofs of Claim that were filed on or before the General Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(2)    Governmental Unit Bar Date.  Unless otherwise ordered by the Bankruptcy Court, all Proofs of Claim of a Governmental Unit must have been filed by October 15, 2006 (the "Governmental Unit Claims Bar Date").  **IF A CLAIM WAS LISTED IN THE SCHEDULES AS NON-CONTINGENT, LIQUIDATED AND UNDISPUTED, A PROOF OF CLAIM NEED NOT HAVE BEEN FILED.**  Both the Schedules and the docket listing Proofs of Claim that were filed on or before the Governmental Unit Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(3)    Administrative Claims Bar Date.  Unless otherwise ordered by the Bankruptcy Court, the Order approving this Disclosure Statement will establish a bar date for Administrative Claims, which bar date shall be ten (10) days prior to the Confirmation Hearing.  The Order approving this Disclosure Statement to be delivered pursuant to Bankruptcy Rules 2002(f) and 3020(c) will set forth such date and constitute notice of the Administrative Claims bar date.  The Plan Proponents and any other party in interest will have thirty (30) days after the Administrative Claims bar date to review and object to such Administrative Claims before a hearing for determination of such Claims is held by the Bankruptcy Court.

(b)    Executory Contracts and Unexpired Leases.  Unless otherwise ordered by the Bankruptcy Court, parties to executory contracts or unexpired leases that are rejected under the Plan must file any Claims for damages resulting from such rejection within thirty (30) calendar days after the Confirmation Date.  Parties to executory contracts or unexpired leases that were or may be rejected by motion or otherwise before Confirmation must file Proofs of Claim for any rejection damages in accordance with the Bankruptcy Court's Order with respect to such rejection.

## ARTICLE 2

## THE BANKRUPTCY CASE

2.1 <u>History of the Debtor and Factors Precipitating the Bankruptcy Case</u>. The Debtor is engaged in the business of developing and overseeing the implementation of unique programs designed to ensure compliance with the complex rules and regulations governing third-party administration of Medicare and Medicaid insurance programs. It specializes in administering insurance programs that cater to patients in rural areas. It was formed initially as a corporation in 2000 by Gary Simmons and others, who owned or controlled virtually all of the issued and outstanding stock; in 2003, it converted into a limited liability company, again with Simmons in control.

The company had profitable contracts with the Texas CHIP (Children's Health Insurance Program) and the Florida Healthy Kids Program; in 2003, the Debtor generated over $23 million in gross revenues.

Subsequently, the Debtor lost the Texas CHIP contract, which was its most valuable contract, and its efforts to obtain new contracts met with limited success. The resulting loss of revenues, together with other factors, impacted the Debtor's ability to pay its operating expenses.

During the late summer of 2005, Mirabilis and Simmons began discussions regarding the future of the Debtor and its affiliated companies Cadent Underwriters, Inc. ("Cadent Underwriters"), BenComp National Corp. ("BenComp"), and Cadent Administrators, Inc. ("Cadent Administrators") (collectively, the "Cadent Companies"). During the initial and subsequent meetings, Simmons told Mirabilis that the Debtor was or soon would be unable to fund its payroll obligations and needed to borrow funds. Simmons claimed that the Debtor's financial setbacks were caused by a host of problems.

By October of 2005, the Debtor did not have sufficient available funds to meet its payroll obligations. At that time, the Debtor requested a loan from Mirabilis. Mirabilis agreed and provided the Debtor with a line of credit which was subsequently increased with the understanding that Mirabilis would provide a significant credit facility using a conventional financing vehicle in a relatively short time.

On November 21, 2005, Mirabilis, the Debtor, Simmons and the other existing equity unit holders entered into a Membership Interest Purchase Agreement ("Purchase Agreement"), by which Simmons sold 2,653,332 equity units in the Debtor to Mirabilis. These units constituted 25 percent of all of the issued and outstanding equity units of the Debtor, and included 2 of the 3 voting units of the Debtor. The Purchase Agreement also provided for the following, among other things:

- $10,000 in cash, paid by Mirabilis to the Debtor and booked as a capital contribution;
- A $3 million line of credit from Mirabilis to the Debtor, from which $638,396.00 was to be drawn immediately and paid to satisfy the sums owed on the previous lines of credit; and

- Effective March 30, 2006, a $475,000 reduction of the sums owed by the Debtor to Mirabilis on the $3 million line of credit.

On November 21, 2005, Mirabilis also entered into three other Membership Interest Purchase Agreements or Stock Purchase Agreements with Simmons and the other members or stockholders of Cadent Underwriters, BenComp and Cadent Administrators, by which Mirabilis acquired 25 percent of the issued and outstanding equity units or stock, as the case may be, of each of Cadent Underwriters, Bencomp and Cadent Administrators. Separate Shareholders and Voting Agreements were executed and Mirabilis was, purportedly, granted control of the board of directors of each of the companies. Mirabilis, the Debtor and other parties also executed certain loan documents to evidence a $3 million line of credit.

Significant disputes exist with respect to the subsequent events and the actions taken by Mirabilis pursuant to these agreements, as well as certain other agreements. It is not disputed that Simmons was eventually effectively removed entirely from the Debtor's operations. The Chapter 11 Trustee and Simmons have asserted that Mirabilis acted improperly. Mirabilis vigorously denies such allegations. It is the purpose of the Plan to completely resolve all of these disputes. Rather than attempt to provide a complete recitation of the disputed contentions by the various parties, the Plan Proponents have agreed to the following selected statements to characterize the nature of the disputes.

Mirabilis maintains that after the execution of the Purchase Agreement it began to discover the true poor financial condition of the Debtor. For example, the Debtor had obtained funds from MedImpact that were improperly handled. Simmons and Mirabilis blame one another for these problems. The Chapter 11 Trustee has not fully allocated blame. In any event, it is now apparent that MedImpact has been repaid the entire amount of any claim it may assert.

In February of 2006, Mirabilis sent a notice to the Debtor advising it that it had defaulted under the $3 million line of credit by failing to make required payments and by failing to disclose facts that could cause it to be sued in litigation that could materially effect its financial condition. The Chapter 11 Trustee contends that the notice was ineffective for a variety of reasons including that Mirabilis was already in control of the Debtor's operations, there was no default of the line of credit agreement, the funds had not been advanced to the Debtor, the funds advanced were risk capital as opposed to debt to be repaid, and certain funds had already been paid to Mirabilis by the Cadent Companies.

Brian Fisher was engaged to serve as the CEO in place of Simmons after Simmons was removed from the premises of the Debtor and the Cadent Companies. Mirabilis contends that Fischer quickly discovered that the financial records of the Debtor and the other borrowers were entirely disorganized, and that Fisher requested that Mirabilis send a team of financial professionals to review the documents of the companies. By March of 2006, Fischer and Mirabilis concluded with reasonable certainty that the Debtor could not resurrect its business revenues or pay its creditors, including Mirabilis (which at the time, according to Mirabilis, was owed in excess of $1.5 million). The Debtor, under the control of Mirabilis, concluded that it was in the best interests of the creditors of the Debtor for the Debtor to obtain financial oversight of the Bankruptcy Court and file for relief under Chapter 11. The Chapter 11 Trustee and Simmons contend that the decision to seek relief under Chapter 11 was improper because, among other things, it was predicated on unenforceable documentation and it triggered inevitable

difficulties for the Debtor and the Cadent Companies with respect to contracts with governmental entities.

2.2     Post-Petition Proceedings and Events.

(a)     Case Events.  When the Bankruptcy Case was filed, the principals of the Debtor continued to operate the company as a debtor-in possession under §1107 of the Bankruptcy Code.  Subsequently, the Office of the United States Trustee ("US Trustee") filed a motion to appoint a Chapter 11 trustee pursuant to Section 1104(a) of the Bankruptcy Code (the "Trustee Motion").  On May 16, 2006, the Bankruptcy Court granted the Trustee Motion, and the Chapter 11 Trustee was appointed on May 22, 2006.

(b)     Business Events.  During the Bankruptcy Case the operations of the Debtor have not materially improved. The Debtor has continued to lose valuable contracts, including the Florida Healthy Kids contract, and has not generated sufficient revenue to pay all of the operational expenses necessary to independently conduct business. However, to allow a plan of reorganization to be developed, Mirabilis and its affiliates have not sought a forced payment of accruing obligations for a variety of activities necessary for the Debtor to remain an operating entity.

The Debtor, operating under the Chapter 11 Trustee, has focused on becoming a more efficient operation.  It has significantly reduced salaries and increased operating efficiency, while continuing to work to attract new business opportunities.  Unfortunately, however, the Debtor has not procured any significant new source of business income during the pendency of this reorganization.

(c)     Oscher Consulting, P.A. Investigation of Mirabilis Involvement.  The Trustee Motion contained allegations of fraud and impropriety.  The appointment of the Chapter 11 Trustee was not opposed. The Chapter 11 Trustee began an investigation of the alleged facts and circumstances and was prepared to initiate and pursue substantial claims against Mirabilis, certain of its affiliates, its principals, and others when the proposal to avoid the delay, uncertainty and expense of litigation by resolving all disputes through a settlement in the Plan was advanced.

In response to the allegations of the Chapter 11 Trustee and the US Trustee, counsel for Mirabilis retained the services of Oscher Consulting, P.A. ("Oscher Consulting").  Oscher Consulting is a reputable Tampa accounting firm specializing in bankruptcy matters.  Steven S. Oscher, C.P.A. has served in numerous bankruptcy cases as a Chapter 11 trustee.  As such, Oscher Consulting has considerable experience in fraud investigations and forensic accounting, understands the elements of fraud, and has investigated numerous circumstances of fraudulent conduct.  Oscher Consulting was hired to independently investigate the allegations of fraud and impropriety made by the US Trustee, and thereafter the Chapter 11 Trustee, and to issue its findings and the results of the investigation to all parties regardless of the outcome.

There is no dispute as to the credentials and good faith of Oscher Consulting in the performance of its services in the Bankruptcy Case. On August 23, 2006, Oscher Consulting issued its *Financial Transaction Investigation for Counsel for Mirabilis Ventures, Inc. – First Status Report*, (the "First Oscher Report").  Oscher Consulting reviewed, investigated and analyzed specific financial transactions between Mirabilis, including its subsidiaries and

affiliates, and the Debtor, including its subsidiaries and affiliates. The First Oscher Report was filed in the Bankruptcy Case on August 24, 2006 (Docket No.139).

On September 8, 2006, Oscher Consulting issued its *Supplement to the First Status Report* (the "Supplement"). The Supplement analyzed, among other things, the flow of funds within the Debtor and the Cadent Companies focusing on the period from September 2005 through July 2006. The Supplement will be filed in the Bankruptcy Case. Copies of the entire First Oscher Report and the Supplement are attached hereto as Composite Exhibit "B."

In light of the proposed settlements that are incorporated in the Plan, the Chapter 11 Trustee suspended further discovery and other investigations that would otherwise be conducted to independently verify the reliability and accuracy of the Oscher Consulting conclusions. Therefore, the Chapter 11 Trustee does not endorse or otherwise countenance any conclusions reached by Oscher Consulting. However, the Chapter 11 Trustee is satisfied that based on the proposed settlements incorporated in the Plan, the delay and expense of continued investigation is not warranted.

2.3    Debtor's Pre-Petition and Post-Petition Secured Debt.  Since the Petition Date, the Debtor has incurred no additional secured debt. The Debtor's pre-petition debt is set forth more fully elsewhere in this Disclosure Statement.  As noted above, the Chapter 11 Trustee has disputed for a variety of reasons the secured status of the claims asserted by Mirabilis. The settlement embodied in the Plan renders moot these disputes because the Mirabilis Claim has been bifurcated into an allowed secured claim and an allowed unsecured claim and no payments will be made to Mirabilis that could dilute or impair satisfaction of other Allowed Claims. Moreover, any claims that could be asserted by Paymaster or other affiliates of Mirabilis will likewise not impact distributions to Allowed Claims.

2.4    Summary of Pending Litigation and Controversies.

(a)    Avoidance Actions.  The Plan Proponents are aware of certain transfers made within the preference period that may qualify as preferential transfers under the Bankruptcy Code.  Under the Plan, the Reorganized Debtor will not pursue any preferential transfer action against any creditor. The Plan Proponents are also aware of certain other avoidance actions that may be pursued, including, but not limited to, fraudulent transfer actions. Under the Plan and the Mutual General Release, any such actions as to the Parties to the Mutual General Release will be resolved as to such Parties. Accordingly, the Reorganized Debtor will not pursue any avoidance actions against any of the parties to the Mutual General Release. A true and correct copy of the Mutual General Release which identifies each of the Parties is attached hereto as Exhibit "C." Finally, under the Plan, the Reorganized Debtor will make the decision of whether to bring any avoidance action against an Entity that is not a Party to the Mutual General Release.

(b)    Claim Objections.  The Plan Proponents have preliminarily reviewed the filed and scheduled claims and believe objections to claims will be necessary because the amount of certain claims are overstated or there are duplicate claims.  The Plan Proponents with the assistance of counsel will attempt to resolve issues involving these claims prior to Confirmation in lieu of filing an objection.  Nevertheless, in the event objections are necessary, objections will

be required to be filed within ninety (90) days of the Effective Date as set forth in Section 7.4 of the Plan, unless otherwise ordered by the Bankruptcy Court.

(c)     Litigation Commenced Pre-Petition.   Prior to the Debtor's bankruptcy filing, the following lawsuit(s) were pending:

(1)     *Brown McCarroll, LLP v. Community Health Solutions of America, LLC,* No. D-1-GN-06-0368; In the 200th Judicial District Court of Travis County, Texas.

(d)     Adversary Proceedings Commenced Post-Petition.   As of the date of this Disclosure Statement, the following adversary proceedings have been commenced or are pending:

(1)     *Larry S. Hyman v. Cadent Underwriters, Inc, Cadent Administrators, Inc., BenComp National Corp., and Community Health Solutions Of America, Inc.,* Adv. Pro. No. 8-06-ap-246; and

(2)     *Larry S. Hyman v. Common Paymaster Corporation and Mirabilis Ventures, Inc.,* Adv. Pro. No. 8-06-ap-328.

Although other claims have been investigated, and could be pursued, the Plan Proponents instead have determined that the Plan represents the best opportunity for the estate to realize a meaningful recovery in a prompt and cost-effective manner.

2.5     Other Significant Post-Petition Events.

(a)     Chapter 11 Trustee's Application to Employ Counsel.   On June 5, 2006, the Chapter 11 Trustee filed an application seeking the Bankruptcy Court's authorization to employ John A. Anthony, Esq., and the law firm of GrayRobinson, P.A. (collectively, "GrayRobinson"), to represent him in the Bankruptcy Case (the "Application").   On June 19, 2006, the Bankruptcy Court entered an order approving the Application.

## ARTICLE 3

### CLASSIFICATION AND TREATMENT OF
### CLAIMS AND INTERESTS AND RELATED ISSUES

3.1     Classification of Claims and Interests.

(a)     Classification.

(1)     General.   Section 4.2 of the Plan sets forth the designation of Classes of Claims and Interests.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.

(2)     Unclassified Claims.  In accordance with Section 1123(a)(1) of the Bankruptcy Code all Administrative Claims and Priority Tax Claims of the Debtor have not been classified and are excluded from the Classes established in Section 4.2 of the Plan.  The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article 3 of the Plan.

3.2     Classes.  For the purposes of the Plan, the Claims against, or Interests in, the Debtor are grouped in the following Classes in accordance with Section 1122(a) of the Bankruptcy Code:

(a)     Class 1 – Other Priority Claims.  Class 1 consists of all Other Priority Claims.

(b)     Class 2 – Small Claims.  Class 2 consists of all Small Claims.

(c)     Class 3 – Claim of Mirabilis.  Class 3 consists of the Mirabilis Claim.

(d)     Class 4 – Other Secured Claims.  Class 4 consists of separate sub-classes for each Other Secured Claim against the Debtor.  Each sub-class is deemed to be a separate class for all purposes under the Bankruptcy Code, including voting.

(e)     Class 5 - Other Unsecured Claims.  Class 5 consists of all Other Unsecured Claims.

(f)     Class 6 - Settlement Claim.  Class 6 consists of Simmons Proof of Claim.

(g)     Class 7 - Subordinated Claims.  Class 7 consists of Subordinated Claims.

(h)     Class 8 - Interests in Community Health Solutions.  Class 8 consists of all Interests in the Debtor.

3.3     Classes of Claims Not Impaired by the Plan.  The Administrative Claims, Priority Tax Claims, Other Priority Claims and Small Claims are not impaired by the Plan.  Under Section 1126(f) of the Bankruptcy Code, the holders of those Claims are presumed conclusively to have voted to accept the Plan, and therefore, the votes of those holders shall not be solicited.

3.4     Classes of Claims Impaired by the Plan.  Classes 3, 4, 5 and 6 are impaired by the Plan.  The holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

3.5     Classes of Interests Impaired by the Plan and Deemed to Have Rejected the Plan.  Classes 7 and 8 are impaired by the Plan and the holders of such Subordinated Claims and Interests are not entitled to receive or retain any property under this Plan on account of such Subordinated Claims and Interests.  Under Section 1126(g) of the Bankruptcy Code, the holders of such Subordinated Claims and Interests are deemed to have rejected this Plan, and therefore, the votes of such holders shall not be solicited.

3.6    Treatment of Allowed Claims and Allowed Interests.

(a)    General.  The Allowed Claims and Allowed Interests, as classified in Article 4 of the Plan, shall be satisfied in the manner set forth in Article 6 of the Plan.  The treatment of, and the consideration to be received by, holders of Allowed Claims pursuant to the Plan shall be in full satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims.

(b)    Unimpaired Classes of Claims.  The following constitutes the treatment under the Plan of the Allowed Unimpaired Classes of Claims:

(1)    Class 1 – Other Priority Claims.  On the Distribution Date or such other date on which an Allowed Other Priority Claim becomes payable pursuant to any agreement between the Plan Proponents and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such different treatment (on terms no more favorable to the holder than previously agreed to among the parties) as to which the Plan Proponents and such holder shall have agreed in writing.

(2)    Class 2 – Small Claims.  Each holder of an Allowed Small Claim shall receive on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Claim, Cash in an amount equal to 100% of the Allowed amount of such holder's Claim.

(c)    Impaired/Voting Classes of Claims.  The following constitutes the treatment under the Plan of the Allowed Impaired and Voting Classes of Claims:

(1)    Class 3 – Claim of Mirabilis.  Mirabilis shall receive for its Allowed Secured Claim (i) such treatment as shall have been agreed to by Mirabilis and the Reorganized Debtor or (ii) an Allowed Secured Claim paid in accordance with the following terms:

| | |
|---|---|
| Allowed Amount: | $1,232,727.56 as of the Effective Date. |
| Interest Rate: | Prime Rate. |
| Maturity Date: | Five (5) years after the Effective Date. |
| Payment Terms: | Mirabilis shall receive monthly payments of interest only for the first twelve (12) months. Beginning in the thirteenth (13) month and continuing until the fifty-ninth (59) month, Mirabilis shall receive monthly payments of principal and interest based upon a 20-year amortization of its Allowed Secured Claim and payable on the first day of each month commencing in the thirteenth (13) month following the Effective Date.  All remaining |

|                    | principal and accrued interest is due and payable on the Maturity Date. |
|--------------------|-------------------------------------------------------------------------|
| Collateral:        | Mirabilis shall retain it first liens against the collateral securing its Allowed Secured Claim to the same extent, validity and priority that such Claim had prior to the Petition Date or to the extent necessary or deemed appropriate by Mirabilis the Reorganized Debtor shall grant to Mirabilis a first priority lien against the intended collateral. |
| Events of Default: | If the Reorganized Debtor fails to make any payment to Mirabilis as required hereunder within 10 days of such payment becoming due, the Reorganized Debtor shall be in default. Upon such default, Mirabilis shall be entitled to send written notice to the Reorganized Debtor of the default, and if the default is not cured within five (5) business days from the date of the notice, Mirabilis shall be entitled to enforce all rights and remedies it possesses against the Collateral without the need of further relief from the Bankruptcy Court. |

Mirabilis shall receive for its Allowed Unsecured Claim (i) such treatment as shall have been agreed to by Mirabilis and the Reorganized Debtor or (ii) an Allowed Unsecured Claim paid in accordance with the following terms:

|                  |                                                                          |
|------------------|--------------------------------------------------------------------------|
| Allowed Amount:  | $500,000.00 as of the Effective Date.                                    |
| Interest Rate:   | Prime Rate.                                                               |
| Maturity Date:   | Five (5) years after the Effective Date.                                 |
| Payment Terms:   | Mirabilis shall receive monthly payments of interest only for the first twelve (12) months. Beginning in the thirteenth (13) month and continuing until the fifty-ninth (59) month, Mirabilis shall receive monthly payments of principal and interest based upon a 20-year amortization of its Allowed Unsecured Claim and payable on the first day of each month commencing in the thirteenth (13) month following the Effective Date. All |

|                      |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| -------------------- | --- |
|                      | remaining principal and accrued interest is due and payable on the Maturity Date. |
| Collateral:          | None. |
| Events of Default:   | If the Reorganized Debtor fails to make any payment to Mirabilis as required hereunder within 10 days of such payment becoming due, the Reorganized Debtor shall be in default. Upon such default, Mirabilis shall be entitled to send written notice to the Reorganized Debtor of the default, and if the default is not cured within five (5) business days from the date of the notice, Mirabilis shall be entitled to enforce all rights and remedies it possesses without the need of further relief from the Bankruptcy Court |

(2)    Class 4 – Other Secured Claims. On the Effective Date, as shall have been determined by the Plan Proponents in their sole discretion, either (i) the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim shall be left unaltered in accordance with the provisions of Section 1124(2) of the Bankruptcy Code, *provided, however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date; (ii) each holder of an Allowed Other Secured Claim shall (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive deferred Cash payments totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property; (iii) the collateral securing such Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim; or (iv) each holder of an Allowed Other Secured Claim shall be paid in full on the Effective Date. The failure to object to any Other Secured Claim in the Bankruptcy Case shall be without prejudice to the Reorganized Debtor's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Other Secured Claim.

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of the Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Claim until such Allowed Claim is paid in full, at which time such Liens shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; *provided, however*, that the Reorganized Debtor may condition delivery of any final payment upon receipt of an executed release of Liens. Nothing in Section 6.3(b) or elsewhere in

the Plan shall preclude the Reorganized Debtor from challenging the validity of any alleged Lien on any asset of the Debtor or the value of the property that secures any alleged Lien.

(3)    Class 5 - Other Unsecured Claims.  In compromise and settlement of the Affiliate Issues, each holder of an Allowed Other Unsecured Claim shall receive on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Claim, either:

(i) A Pro Rata Share  (allocated among all holders of Allowed Other Unsecured Claims) of the Other Unsecured Claims Fund.

(ii) In the alternative, if the holder of an Allowed Other Unsecured Claim elects to reduce the amount of such Allowed Claim to $2,500.00 by timely return of a completed Claim Reduction Form in accordance with the instructions thereon, on the Distribution Date, Cash in an amount equal to 100% of the Allowed amount of such holder's Claim.

In the event the Pro Rata Share (allocated among all holders of Allowed Other Unsecured Claims) of the Other Unsecured Claims Fund is less than 100%, Mirabilis shall provide the Supplemental Funding to the Disbursing Agent in an amount sufficient to insure that 100% of the Allowed Amount of every Other Unsecured Claim is paid in full no later than the second anniversary of the Effective Date. The Supplemental Funding LC or a deposit of cash, or cash equivalent, will be delivered on or before the Effective Date to secure payment of the Supplemental Funding. Any deferred payment to the holder of an Allowed Other Unsecured Claim shall include interest from the initial Distribution Date as to such Claim until payment at the Prime Rate.

(4)    Class 6 - Settlement Claim.  The holder of the Class 6 Settlement Claim shall receive on the Distribution Date, in full satisfaction, release and discharge of and in exchange for such Allowed Claim, Cash in the amount of $525,000.00.  Simmons, as the holder of the Class 6 Settlement Claim, has accepted the terms and conditions of this special treatment as part of the Plan settlement which benefits all parties.

(d)    Impaired/Non-voting Classes of Claims and Interests.  The following constitutes the treatment under the Plan of the Impaired and Non-voting classes of Claims and Interests:

(1)    Class 7 - Subordinated Claims.  The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.  All Subordinated Claims shall be discharged as of the Effective Date.

(2)    Class 8 - Interests.  All Interests of any kind shall be cancelled, annulled and extinguished as of the Effective Date and the holders thereof shall not receive or retain any property or distribution under the Plan on account of such Interests.

(e)    Administrative Claims.  Each holder of an Allowed Administrative Claim (except any such holder that agrees to different treatment) shall receive the Allowed Amount of such holder's Allowed Administrative Claim, in Cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the Effective Date or as soon thereafter as is

practicable; *provided*, *however*, that Allowed Administrative Claims representing (a) post-petition liabilities incurred in the ordinary course of business by the Debtor and (b) post-petition contractual liabilities arising under loans or advances to the Debtor, whether or not incurred in the ordinary course of business, shall be paid by the Chapter 11 Trustee in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

(f)     Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim (except any such holder that agrees to different treatment) shall receive the Allowed Amount of such holder's Allowed Priority Tax Claim, in Cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the Effective Date or as soon thereafter as is practicable, except to the extent that the holder of a Priority Tax Claim agrees to a different treatment; provided however, at the Plan Proponents' option, the Debtor may pay Priority Tax Claims plus interest accrued thereon over a period not exceeding six (6) years after the date of the assessment of such Claims as provided in Section 1129(a)(9)(C) of the Bankruptcy Code. Furthermore, the obligations under Section 3.2 of the Plan in respect of any Allowed Priority Tax Claim that is secured by a valid, perfected and enforceable Lien shall be collateralized by a continuation of the Lien underlying such Claim and such obligation shall be and become due and payable upon the sale or other disposition of the collateral therefore.

3.7     Plan Implementation.

(a)     Funding of the Plan.  Mirabilis is funding the Plan by providing the New Capital and the Supplemental Funding. Mirabilis delivered the sum of $1,000,000 to a trust account of Bush Ross, P.A. on September 13, 2006, to serve as a deposit of the consideration required by the Plan prior to entry of the Confirmation Order. Upon Confirmation of the Plan, Mirabilis will cause the New Capital to be delivered to the Disbursing Agent in exchange for the issuance of the New Interests in the Reorganized Debtor. The Disbursing Agent will distribute the New Capital and any Supplemental Funding to the holders of Allowed Claims in accordance with the terms of the Plan.

(b)     Supplemental Funding LC. To the extent the New Capital is insufficient to pay all Allowed Class 5 Other Unsecured Claims in full on the Distribution Date, Mirabilis will provide the Supplemental Funding as necessary to insure that every Other Unsecured Claim is paid in full no later than the second anniversary of the Effective Date. The Supplemental Funding LC will be issued on or before the Effective Date to the Disbursing Agent on such terms and in such amount as are agreed by the Plan Proponents, or in the absence of such agreement, as determined by the Bankruptcy Court at the Confirmation Hearing.

(c)     Name and Management of the Reorganized Debtor.  The Reorganized Debtor will retain the Debtor's name and will proceed in its business operations under the management and control of Mirabilis following confirmation of the Plan. The managing partner of the Debtor will be Robert W. Konicki.   Mr. Konicki was employed and compensated by Mirabilis to operate the Debtor  and has continued in that capacity under the Chapter 11 Trustee.

(d)     Rights of the Reorganized Debtor.  In addition to the other rights of the Reorganized Debtor and Disbursing Agent under the Plan, the Reorganized Debtor and the Disbursing Agent shall have the right to retain and compensate professionals including, but not

limited to, the professionals retained by the Debtor prior to the Effective Date and other Persons to assist them in the performance of their duties under the Plan.

(e)     Revesting.  Except as otherwise expressly provided in the Plan, on the Effective Date, the Reorganized Debtor shall be vested with all of the assets and property of the Debtor's former Estate, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests and may each operate its business free of any restriction imposed by the Bankruptcy Code or by the Bankruptcy Court.

(f)     Duties of the Disbursing Agent Post-Confirmation.  As specifically provided for in the Plan and to the extent applicable, the Disbursing Agent shall (i) manage the New Capital and Supplemental Funding pending distribution of such property pursuant to the Plan; (ii) examine Proofs of Claim and object to the allowance of any claim that is improper; (iii) distribute property of the Estate pursuant to the distribution provisions set forth in the Plan; and (iv) file a final account of the distributions made by the Disbursing Agent.

(g)     Duties of Chapter 11 Trustee and Counsel Post-Confirmation.  The Chapter 11 Trustee and his counsel shall be discharged from any obligation or responsibility to or for the benefit of the Estate on the Effective Date.

3.8     Effects of Plan Confirmation.

(a)     Injunctions, Releases and Discharges.

(1)     Discharge and Release.  Except as specifically provided in the Plan or in the Confirmation Order, effective on the Effective Date, Confirmation shall (a) discharge the Debtor from any and all Claims including any Claim of a kind specified in Sections 502(g), 502(h), 502(i) of the Bankruptcy Code, whether or not (i) a proof of claim based on such Claim was filed or deemed filed under Section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor, (ii) such Claim is or was Allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has voted on or accepted the Plan and (b) terminate all rights and interests of holders of Interests in respect of the Debtor.  Except as specifically provided in the Plan to the contrary, the rights that are provided in the Plan shall be in complete settlement, satisfaction, release and discharge of and shall void and extinguish all Claims against, Liens on and Interests in the Debtor or the assets and properties of the Debtor.

(2)     Discharge Injunction.  Except as specifically provided in the Plan to the contrary, the satisfaction, release and discharge set forth in subpart (a) of Section 8.1 of the Plan shall also operate as an injunction prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from any offset (a) any Claim against or Interest in the Debtor, by any Entity and (b) any cause of action, whether known or unknown, against Mirabilis based on the same subject matter as any Claim or Interest described in subpart (a) of Article 8.1 of the Plan.

(b)     Terms of Injunctions and the Automatic Stay.  Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, the injunction described in Section 8.1 of the Plan shall remain in full force and effect following the Effective Date.  All other injunctions or automatic stays provided for in the Bankruptcy Cases pursuant to Section 362 of the

Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(c)    No Liability for Tax Claims.  Unless a taxing authority has asserted a Claim against the Debtor before the bar date established therefore, no Claim of such authority shall be Allowed against the Debtor or the Reorganized Debtor for taxes, penalties or interest arising out of the failure, if any, of the Debtor to have filed any tax return, including, but not limited to, any income tax return or franchise tax return in any prior year or arising out of an audit of any return for a period before the Petition Date. The Plan Proponents have investigated the facts and circumstances of the Debtor, and are not aware of any tax obligation is outstanding to any taxing authority at this time, except in the ordinary course of operation of the Debtor's business.

(d)    Disallowed Claims and Disallowed Interests.  On and after the Effective Date, the Debtor shall be fully and finally discharged of any liability or obligation on a disallowed Claim or a disallowed Interest, and any Order creating a disallowed Claim or a disallowed Interest that is not a Final Order as of the Effective Date solely because of a Person's or Governmental Unit's right to move for reconsideration of such Order pursuant to Section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of Section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest; and (b) disallowing or subordinating, as the case may be, any Claims for penalties or punitive damages.

(e)    Causes of Action.

(1)    Preferences, Fraudulent Conveyances and Other Causes of Action Pursuant to Section 547 of the Bankruptcy Code, a trustee may avoid as a preference a transfer of property made by the debtor to or for the benefit of a creditor on account of an antecedent debt while the debtor was insolvent, if that creditor received more than it would have received in a liquidation of the debtor under Chapter 7 of the Bankruptcy Code had the payment not been made and if the payment was made (i) within ninety (90) days before the date that the Bankruptcy Case commenced, or, (ii) if the creditor is an "insider" as defined in the Bankruptcy Code, within one year before the commencement of the Bankruptcy Case.  A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of its Bankruptcy Case.  The power to avoid preferences is subject to a number of exceptions set forth in Section 547 of the Bankruptcy Code, including one exception applicable to the payment of obligations in the ordinary course of business on ordinary business terms.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the Bankruptcy Case) for which the transferee was not repaid, such extension constitutes an offset against any otherwise recoverable transfer of property.  If a transfer is recovered, the transferee obtains a general unsecured claim against the debtor to the extent of the recovery.

Pursuant to Section 548 of the Bankruptcy Code, a trustee may avoid a fraudulent transfer of property, including the granting of a security interest in property, made while the debtor was insolvent or which rendered the debtor insolvent, if the debtor received less than

reasonably equivalent value in exchange for such property and if the transfer was made within one (1) year before the commencement of the Bankruptcy Case. Pursuant to Section 544 of the Bankruptcy Code, a trustee may avoid a transfer of property that is avoidable under applicable non-bankruptcy law. Section 544 of the Bankruptcy Code enables a debtor to apply applicable state laws, including fraudulent conveyance laws, to avoid a transfer of property.

(2)     Retention and Enforcement of Causes of Action. Except as set forth in the Plan, pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor retains and has the exclusive right to enforce against any Person or Governmental Unit any and all Causes of Action and rights of the Debtor that arose both before and after the Petition Date, including, but not limited to, the rights and powers of a trustee and debtor in possession and all Causes of Action granted pursuant to and still existing under Sections 502, 544, 545, 548, 549, 550, 551 and 553 of the Bankruptcy Code. In addition, the Reorganized Debtor may bring other Causes of Action or obtain tolling agreements with entities against which known Causes of Action exist. All creditors and interested parties shall be advised that there may be Causes of Action that the Reorganized Debtor may bring where facts have been concealed or were not otherwise fully known at the time of the confirmation of the Plan. Accordingly, no party shall be entitled to rely on the doctrine of res judicata under the Confirmation Order to assert that no claims can be brought. Provided, however, it is expressly understood that consistent with the intent of the Plan Proponents that Allowed Other Unsecured Claims be paid in full, no action to avoid a transfer as preferential under Section 547 of the Bankruptcy Code shall be filed. Provided further, however, it is expressly understood that consistent with the complete and final resolution of the Affiliate Issues, the Mutual General Release will release any and all claims that may exist as to the Parties to the Mutual General Release.

3.9     Assumption and Rejection of Executory Contracts and Unexpired Leases. Any unexpired lease or executory contract that has not been expressly assumed with the Bankruptcy Court's approval on or prior to the Confirmation Hearing (either through the Plan or otherwise) shall, as of the Confirmation Hearing and subject to the occurrence of the Effective Date, be deemed to have been rejected unless there is pending before the Bankruptcy Court on the Confirmation Date a motion by the Debtor to assume such executory contract or unexpired lease.

3.10     Cure. Any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to Section 365(b)(1) of the Bankruptcy Code (a) by payment of the default amount in Cash on the Effective Date or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease and the Debtor. In the event of a dispute regarding (i) the amount of any cure payments, (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving assumption.

3.11     Damages Upon Rejection. The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Person seeking damages by reason of the rejection of any executory contract or unexpired lease; provided, however, that such Person files a Proof of Claim with the Bankruptcy Court before thirty (30) calendar days following the Confirmation Date or such other deadline established by the Bankruptcy Court. To the extent any such Claim is Allowed by a Final Order of the Bankruptcy Court, such Claim shall become, and shall be

treated for all purposes under the Plan as, an Allowed Unsecured Claim and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan. The Plan shall constitute notice to Persons that may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the bar date for filing a Proof of Claim in connection therewith; provided, however, that the Debtor shall have no obligation to notify such Persons and that the Confirmation Date has occurred.

3.12    Contracts and Leases Assumed by the Debtor.   Under the Plan, the Debtor will assume its leases or executory contracts with the following entities: (a) Florida Comprehensive Health Association; (b) South Carolina Department of Health and Human Services; (c) Strategic Health Development Corporation; (d) SHPS Health Management Solutions, Inc.; (e) Verizon Wireless; and (f) Zone Telecom, Inc.   The Debtor shall also assume any unexpired or executory contract of the Chapter 11 Trustee entered into to the extent such contract or lease is executory or unexpired, respectively, under Section 365 of the Bankruptcy Code.

3.13    Plan Distributions.   Unless otherwise provided for by the Plan, the Disbursing Agent shall make all distributions under the Plan.   Distributions shall be made on the Distribution Date unless otherwise provided in the Plan or ordered by the Bankruptcy Court.  If the Effective Date, or any other date on which a transaction may occur under this Plan, shall occur on a day that is not a Business Day, the transactions contemplated by this Plan to occur on such day shall occur instead on the next succeeding Business Day.

## ARTICLE 4

### AFFILIATE DISPUTE COMPROMISES

4.1    Issues Subject to Compromises.   **The provisions of Article 2 of the Plan that govern the Affiliate Dispute Compromises and specifically require the exchange of the broad releases in the Mutual General Release are so critical to the reorganization effort that without them the reorganization would fail.**  A true and correct copy of the proposed Mutual General Release is attached as Exhibit "C" to this Disclosure Statement.   The Plan proposes, and its terms embody, a series of compromises and settlements of the Affiliate Issues, which all relate to transactions and business dealings between, among or involving the Debtor, the Plan Proponents and one or more of the Cadent Companies. The waiver of Claims of the Mirabilis Affiliates and the Cadent Companies and the payment of the New Capital and the agreement to provide the Supplemental Funding by Mirabilis are conditioned upon and serve as the primary consideration to be exchanged for the resolution of these issues. **The Plan Proponents believe that without the integral protection of such releases, the Plan would fail. From and after the Effective Date, the releases described in the Plan shall be effective and the Parties shall all be protected.** There are four areas of disputes or potential disputes that are completely and finally resolved under the Plan without the necessity for further litigation and expense.

4.2    Resolution of the Chapter 11 Trustee Substantive Consolidation Claims. The Plan Proponents have studied whether the liabilities and properties of the Debtor should be substantively consolidated for purposes of distributions under a plan of reorganization with the liabilities and properties of certain non-Debtor affiliates, specifically, the Cadent Companies. These issues were raised in the Consolidation Action filed by the Chapter 11 Trustee. These

issues relate primarily to the following: (a) whether the elements necessary to obtain an order of substantive consolidation are satisfied in the Bankruptcy Case; (b) the value of the Debtor's Estate on an individual and a consolidated basis with the Cadent Companies, and the proper method of determining such value; (c) whether the Estate of the Debtor and assets of the Cadent Companies should be treated separately for purposes of making payments to holders of Claims; (d) whether it is possible to attribute particular Claims asserted in the Bankruptcy Case to the Debtor or the Cadent Companies; (e) the value to be accorded to guarantees issued by the Debtor in favor of the Cadent Companies; (f) the strength of the relative rights and positions of the different holders of Claims and the creditors of the Cadent Companies with respect to disputes over substantive consolidation; (g) other issues having to do with the rights of the Estate, Claims, or Classes of Claims vis-à-vis the Cadent Companies who are not debtors and may have totally different estates, claims, or classes of claims if subjected to a bankruptcy case; (h) the amount and priority of Claims asserted by or against the Debtor and the Cadent Companies and the potential voidability of certain transfers; and (i) the treatment of equity interests in the Cadent Companies. On the Effective Date, the Chapter 11 Trustee will dismiss the Consolidation Action with prejudice and all Chapter 11 Trustee Substantive Consolidation Claims will be resolved.

(a)     Effect of Compromise and Settlement of Consolidation Action. As a result of the compromise and settlement of the Consolidation Action, (1) no separate Chapter 11 case shall be initiated for any of the Cadent Companies and there shall be no consolidation of the Cadent Companies into the case of the Debtor; (2) the property of the Estate shall not be deemed to be property of any of the Cadent Companies and property of any Cadent Company shall not be deemed to be property of the Estate; (3) claims against any Cadent Company shall not be deemed to be Claims against the Estate; (4) any Proof of Claim filed against the Debtor shall be deemed to be a single claim filed against the Debtor, and all other Proofs of Claim for the same claim filed against the Debtor based upon alleged liability of one or more of the Cadent Companies shall be deemed expunged; (5) except as otherwise provided in the Plan, no distributions under the Plan shall be made on account of Claims made by the Cadent Companies; and (6) all Claims based upon pre-petition unsecured guarantees by the Debtor in favor of any Cadent Company (other than guarantees existing under assumed executory contracts or unexpired leases) or other basis of co-Debtor liability shall be eliminated, and no separate distributions under the Plan shall be made on account of Claims based upon such guarantees or other basis of co-Debtor liability.

The Plan shall not result in the merger or otherwise affect the separate legal existence of the Debtor and the Cadent Companies, other than with respect to distribution rights under the Plan. The Plan shall not (a) impair the validity or enforceability of guarantees that exist under or with respect to assumed executory contracts or unexpired leases as specifically set forth in the Plan; (b) affect valid, enforceable, and unavoidable Liens that would not otherwise be terminated under the Plan, except for Liens that secure a Claim that is eliminated by virtue of the Plan and Liens against collateral that are extinguished by virtue of such Plan; or (c) have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of such structure.

With the exception of the Mirabilis Claim, all Claims by any of the Mirabilis Affiliates or the Cadent Companies or the entitlement to payment of any Administrative Expense of any of the Mirabilis Affiliates or the Cadent Companies shall be disallowed. Specifically, the Mirabilis Affiliates and the Cadent Companies shall waive or withdraw any claim for monies or services

provided to the Debtor after the Petition Date. The Mirabilis Affiliates and the Cadent Companies shall not receive any distribution from the Disbursing Agent of the New Capital.

4.3 <u>Resolution of the Chapter 11 Trustee Recovery Claims.</u> The Plan Proponents have agreed to amicably resolve their disputes with respect to the Recovery Action filed by the Chapter 11 Trustee seeking, among other things, recovery of alleged transfers of the Debtor's property to Mirabilis and Paymaster. On the Effective Date, the Chapter 11 Trustee will dismiss the Recovery Action with prejudice and all Chapter 11 Trustee Recovery Claims will be resolved. Moreover, no new adversary proceedings will be initiated by the Chapter 11 Trustee.

(a) <u>Effect of Compromise and Settlement of Recovery Action.</u> As a result of the compromise and settlement of the Recovery Action, (1) in lieu of the uncertain recovery from Mirabilis and/or Paymaster, who dispute any liability to the Chapter 11 Trustee, the Estate will receive the New Capital for the benefit of holders of Allowed Claims and the Mirabilis Affiliates and the Cadent Companies will waive any right to share in the distribution of the New Capital; (2) Mirabilis and Paymaster will be forever released and discharged from any and all past, pending, present, future, legal, equitable, fixed, contingent, matured, unmatured, liquidated, unliquidated, foreseeable, unforseeable, known, suspected, unsuspected, disclosed, undisclosed, hidden or concealed claims, allegations, demands, obligations, suits, actions, causes of action, proceedings, rights, damages, and costs of any nature whatsoever (regardless of when such claims, allegations, demands, obligations, suits, actions, causes of action, proceedings, rights, damages, and costs of any nature whatsoever accrue or accrued) arising out of, on, in connection with, or in any way relating to the Chapter 11 Trustee Recovery Claims; and (3) the Chapter 11 Trustee will be forever released and discharged from any and all past, pending, present, future, legal, equitable, fixed, contingent, matured, unmatured, liquidated, unliquidated, foreseeable, unforseeable, known, suspected, unsuspected, disclosed, undisclosed, hidden or concealed claims, allegations, demands, obligations, suits, actions, causes of action, proceedings, rights, damages, and costs of any nature whatsoever (regardless of when such claims, allegations, demands, obligations, suits, actions, causes of action, proceedings, rights, damages, and costs of any nature whatsoever accrue or accrued) arising out of, on, in connection with, or in any way relating to the Chapter 11 Trustee Recovery Claims.

4.4 <u>Resolution of Debtor's Lender Related Claims.</u> The Chapter 11 Trustee and other parties in interest in the Bankruptcy Case have asserted from time to time that there is or should be a dispute with Mirabilis with respect to certain transactions in 2005 related to (a) the purchase of member interests of the Debtor from Simmons, (b) the exercise of control over the business operations of the Debtor, (c) the extensions of credit to the Debtor and the agreements to provide credit to the Debtor, and (d) the declaration of a default under a line of credit agreement. These transactions are more fully described elsewhere herein. On the Effective Date, the Debtor's Lender Related Claims will be released and the Mirabilis Secured Claim will be deemed Allowed and treated as provided in the Plan.

4.5 <u>Resolution of Debtor's Simmons Related Claims.</u> The Plan Proponents and other parties in interest in the Bankruptcy Case have investigated the pursuit of significant claims against Simmons, the founder of the Debtor, with respect to (a) the business operations and financial transactions of the Debtor prior to February 2006, (b) the representations and presentation of the financial status of the Debtor to Mirabilis to induce Mirabilis to enter into the transactions in 2005 related to (1) the purchase of member interests of the Debtor from Gary

Simmons, and (2) the extensions of credit to the Debtor and the agreements to provide credit to the Debtor, (c) the amount of the Simmons Proof of Claim, and (d) the equitable subordination of the Simmons Proof of Claim. These issues are more fully described in the Disclosure Statement. On the Effective Date, the Debtor's Simmons Related Claims will be released and the Simmons Proof of Claim will be deemed Allowed as a Class 6 Settlement Claim in the amount of $525,000.00 and treated as a Class 6 Settlement Claim as provided in the Plan. Additionally, the Reorganized Debtor will grant an irrevocable, non-exclusive license to Simmons of the current software used by BenComp National, Inc., and more specifically described as that certain software developed jointly by BenComp National, the Debtor and Cadent, in a form acceptable to Simmons (the "License"). Moreover, without further consideration, Simmons will effect the surrender to Mirabilis of the issued and outstanding shares of the common stock of Cadent Underwriters, Inc. held by Simmons, Graeme Smith, Peter Farrell, Mark Simmons and Kendra Hubbard.

4.6     Rule 408 Restrictions.  Except as expressly provided in the Plan, no document or communication exchanged by the Plan Proponents in the negotiation or furtherance of the settlements in the Plan, and no act by the Plan Proponents in connection with the negotiation, execution or implementation of the settlements, shall be construed as an admission or concession by the Plan Proponents, including without limitation any admission or concession by the Plan Proponents regarding the existence or non-existence of liability for the Affiliate Issues or any other Claim.  No party in interest in the Bankruptcy Case nor its attorneys or agents may invoke, refer to, rely upon, or use the terms of the settlements, or any aspect of the negotiation, execution, or implementation of the settlement, in any litigation, proceeding or forum of any kind or nature whatsoever for the purpose of attempting to establish or prove the acceptance or rejection by the Plan Proponents of any particular interpretation of any statute, regulation or transaction with respect to any claim.  The Plan Proponents are entering into the settlements solely for the purposes of compromising and resolving certain disputes between them respecting the Affiliate Issues in order to avoid further litigation with respect thereto, on the mutual understanding that the substance of the settlement and any related negotiations or acts of implementation fall within the provisions of Rule 408 of the Federal Rules of Evidence and any similar evidentiary rule or principle that precludes the introduction of evidence regarding settlement negotiations and agreements.

4.7     Approval of Compromises and Settlements.  The Plan is deemed to be a motion under Sections 105, 363 and 1123 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for approval of the compromise and settlement of the issues described in Article 4 of this Disclosure Statement.  The Confirmation of this Plan shall constitute approval of the motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions approving the compromises and settlements as fair and equitable and within the bounds of reasonableness.

## ARTICLE 5

## ESTIMATED CLAIMS AND ESTIMATED RECOVERIES BY CLASS

5.1     General.  The Plan Proponents have analyzed the Proofs of Claim filed in the Bankruptcy Case, as well as the Claims scheduled by the Debtor for which no Proofs of Claim were filed.  The estimated Allowed Claims and Allowed Interests and estimated recoveries in the

Bankruptcy Case are summarized below. Certain estimated Allowed Claims, Allowed Interests and estimated recoveries set forth below represent the best estimates of the Debtor and its professionals based upon the information available to them. **THE PLAN PROPONENTS AND THEIR PROFESSIONALS HAVE EXPENDED CONSIDERABLE TIME AND EFFORT TO ENSURE THE ACCURACY OF THE ESTIMATED INFORMATION SET FORTH BELOW; HOWEVER, NO REPRESENTATION CAN BE MADE THAT SUCH INFORMATION IS WITHOUT INACCURACY. THE INFORMATION SET FORTH BELOW IS SUBJECT TO THE UNCERTAINTIES OF LITIGATION WITH RESPECT TO MANY CLAIMS AND INTERESTS AND OTHER FACTORS WHICH MAY OR MAY NOT BE RESOLVED IN THE DEBTOR'S FAVOR. THEREFORE, NO ASSURANCE CAN BE GIVEN THAT THE ESTIMATED ALLOWED CLAIMS AND INTERESTS ARE EXACT OR THAT THE ESTIMATED RECOVERIES WILL BE ACHIEVED.**

5.2    <u>Estimated Claims and Interests and Estimated Recoveries</u>. The Plan Proponents estimate that the Allowed Claims against and Allowed Interests in the Debtor and the corresponding estimated recoveries under the Plan are as follows[2]:

| Category or Class of Claims or Interests | Est. Total No. of Allowed Claims | Est. Total Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Administrative Claims | 20 | $   400,000.00[3] | 100% |
| Priority Tax Claims | 3 | 47,548.88 | 100% |
| Other Priority Claims | 3 | 4,104.10 | 100% |
| Mirabilis Claim | 1 | 1,732,727.56 | 100% |
| Small Claims | 68 | 50,178.76 | 100% |
| Other Unsecured Creditors | 34 | 863,546.42 | 100% |
| Settlement Claim | 1 | 525,000.00 | 100% |
| Subordinated Claims | 1 | 150,000.00 | 0% |
| Interests | 15 | 0.00 | 0% |

---

[2]    The following estimates have been prepared solely by the Plan Proponents and their professionals. Such estimates shall not bind any party including the Reorganized Debtor.

[3]    This amount includes accounts payable of the Debtor as of 8/31/06 which are expected to be paid in the ordinary course of the Debtor's business plus expenses for the Trustee and his professionals.

## ARTICLE 6

## SELECTED FINANCIAL INFORMATION

6.1     Selected Financial Information.  An analysis of the Debtor's financial condition and the results of the Debtor's operations are contained in the First Oscher Report and the Supplement discussed in Section 4.2 above. Copies of the Debtor/Chapter 11 Trustee's Monthly Financial Reports have been filed in the Bankruptcy Case and are available upon request.

## ARTICLE 7

## ALTERNATIVES TO THE PLAN

7.1     Best Interests of Holders of Claims and Interests.

In order to confirm a Chapter 11 plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all classes impaired by the Plan.  The "best interests" test requires that the Bankruptcy Court find either that all members of an impaired class of claims or interests have accepted the Plan or that the Plan will provide such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what members of each impaired class would receive if the Debtor was liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of the collateral and, then, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in this Chapter 11 case (such as compensation of attorneys, financial advisors and accountants) that are allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the Debtor during the pendency of the Chapter 11 case.  The liquidation itself could trigger certain priority claims including litigation costs that would likely be incurred to resolve numerous disputes between parties in interest.  The liquidation could also trigger priority claims arising from the wind-down of the Debtor's operations during the Chapter 7 case.  All such administrative and priority claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay general claims or to make any distribution in respect of equity interests.

In the event that proceeds remain after satisfaction of all allowed secured claims, administrative claims and priority claims, the remaining assets would be distributed pursuant to the "absolute priority rule," which requires that no junior creditor receive any distribution until all senior creditors are paid in full, and no equity holder receive any distribution until all

creditors are paid in full, with interest. Once the Bankruptcy Court ascertains the projected recoveries of secured creditors, priority claimants, general unsecured creditors and equity security holders in a liquidation, those recoveries are compared with the distribution offered to each class of claims or interests under the Plan to determine if the Plan is in the best interests of creditors and equity security holders of each class.

The Plan Proponents believe that a Chapter 7 liquidation would result in recoveries substantially less than the recoveries expected to be received pursuant to the Plan because, among other things, the Debtor's assets are fully encumbered or practically fully encumbered by the claims of secured creditors. In essence, the object of the Plan is to preserve the value of the Debtor's continuing operation for the benefit of the holders of Unsecured Claims.

7.2    Chapter 7 Liquidation Analysis.

A Chapter 11 plan cannot be confirmed unless the Bankruptcy Court finds that the plan is in the "best interests" of creditors and equity holders, taking into account the liquidation value of the debtor. In applying the "best interests" test of Section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court would ascertain the hypothetical recoveries in a Chapter 7 liquidation to secured creditors, priority claimants, general unsecured creditors and equity holders. These hypothetical Chapter 7 liquidation recoveries would then be compared to the distributions offered to each class of claims or interests under the proposed Chapter 11 plan to determine if the plan satisfies the "best interests" test as set forth in Section 1129(a)(7) of the Bankruptcy Code.

The Liquidation Analysis attached hereto as Exhibit "D" is based on a number of estimates and assumptions that, while considered reasonable, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor or any Chapter 7 trustee. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtor was, in fact, to undergo such a Chapter 7 liquidation, and actual results could vary materially from those shown here. In addition, any liquidation would necessarily take place in the future under circumstances which presently cannot be predicted. Accordingly, if the Debtor's Estate was in fact liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth below and no representation or warranty can be or is being made with respect to the actual proceeds that could be received in a Chapter 7 liquidation.

7.3    Other Alternatives to the Plan.

If the Plan is not confirmed, the Plan Proponents or any other party in interest could attempt to formulate a different Chapter 11 plan or convert the Bankruptcy Case to a Chapter 7. The Chapter 11 Trustee has investigated the facts and circumstances leading up to his appointment, and has assessed the feasibility and advisability of bringing litigation against parties perceived to have liability to the estate and its creditors. The Chapter 11 Trustee has concluded, based in large measure upon the deposit of the New Capital in a trust account of Bush Ross, P.A. pending confirmation of the Plan, that the compromises upon which the Plan is predicated present a preferable alternative to litigation.

**THE PLAN PROPONENTS BELIEVE THAT THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO THE CHAPTER 7 LIQUIDATION ALTERNATIVE BECAUSE THE PLAN SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN A CHAPTER 7 LIQUIDATION.**

## ARTICLE 8

### SOURCE OF INFORMATION PROVIDED

8.1     <u>Source of Information</u>. The Plan Proponents have used the available books and records of the Debtor, the First Oscher Report and the Supplement, their knowledge and experience, and opinions of legal counsel in the preparation of the information set forth in this Disclosure Statement.

8.2     <u>Additional Information</u>. Statements contained herein concerning the provisions of any document are not necessarily complete, and in each instance reference should be made to such document for the full text thereof. Each such statement is qualified by such reference.

## ARTICLE 9

### CONCLUSION

**THE PLAN PROPONENTS URGE HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY FILING THEIR BALLOTS WITH THE BANKRUPTCY COURT NO LATER THAN OCTOBER 6, 2006.**

Dated: September 18, 2006

Mirabilis Ventures, Inc.

By: _____
Its:     President

Common Paymaster Corporation

By: _____
Its:     President

_____
Chapter 11 Trustee for Community Health
Solutions of America, LLC