**EXHIBIT "B"**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - - - - - - - - - - - - - - x
IN RE:                          :
                                :
COMMUNITY HEALTH SOLUTIONS       : Case No. 06-01215-8C1
OF AMERICA, LLC                  : Chapter 11
                  Debtor        :
- - - - - - - - - - - - - - - x U.S. Courthouse
                                  801 N. Florida Avenue
                                  Tampa, Florida
                                  April 5, 2007
                                  1:37 p.m.


HEARING

1) Chapter 11 Trustee's Motion to Extend Time to Seek
Revocation of Confirmed Plan

2) Emergency Motion to Compel Disbursing Agent to Pay Allowed
Claims or to Replace Disbursing Agency Filed by Jeffrey Warren


B E F O R E:   THE HONORABLE CATHERINE PEEK MCEWEN
               Bankruptcy Judge


JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida  33556
(813) 920-1466

APPEARANCES:

| | |
|---|---|
| For Larry Hyman: | CHERYL THOMPSON, Esquire<br>JOHN ANTHONY, Esquire<br>SCOTT LILLY, Esquire<br>Gray Robinson<br>201 North Franklin Street<br>Suite 2200<br>Tampa, Florida 33602<br>813-273-5000 |
| For the Reorganized<br>Debtor: | JEFFREY WARREN, Esquire<br>ANDREW JENKINS, Esquire<br>Bush Ross, PA<br>PO Box 3913<br>Tampa, Florida 33601<br>813-223-9620 |
| For the US Trustee: | CYNTHIA BURNETTE, Esquire<br>Office of the US Trustee<br>501 East Polk Street<br>Suite 1200<br>Tampa, Florida 33602<br>813-243-5000 |
| Also Present: | LARRY HYMAN, Disbursing Agent |

```
 1              P R O C E E D I N G S
```

 2        COURTROOM DEPUTY:  Community Health Solutions of

 3  America, Case No. 06-01215.

 4        THE COURT:  The Court will take appearances.

 5        MS. THOMPSON:  Good afternoon, Your Honor, Cheryl

 6  Thompson on behalf of Larry S. Hyman the Disbursing Agent

 7  and formerly Chapter 11 Trustee who is with me in the

 8  courtroom as is my partner John Anthony and Scott Lilly.

 9        THE COURT:  All right.  Thank you.

10        MS. BURNETTE:  Cindy Burnette for the U.S. Trustee.

11        MR. WARREN:  Good afternoon, Your Honor, Jeffrey

12  Warren on behalf of the Reorganized Debtor, and I have

13  with me Drew Jenkins of my office.

14        MR. JENKINS:  Good afternoon, Your Honor.

15        THE COURT:  All right.  We have two matters.  One

16  was scheduled just today.  And given the very brief

17  notice that was provided for that second matter, I'm

18  probably -- I'm probably going to only listen and not

19  make a ruling unless one side tells me that the short

20  notice is no problem or was no problem.

21      All right, then.  The first matter on the calendar,

22  though, is the Chapter 11 Trustee's motion -- well, I

23  guess it's Mr. Hyman's motion to extend the time to seek

24  revocation of the Confirmed Plan.  Is there any

25  opposition to that?

1        MR. WARREN:   Yes, Your Honor.  We did file a

2    written response last night.  We attempted to resolve the

3    matter by asking that the motion be withdrawn.  When we

4    were informed finally that it would not be withdrawn, we

5    filed a response that we had previously provided to

6    counsel for the moving party.

7        THE COURT:   Okay.  All right, then, Miss Thompson,

8    go ahead and you can make the record.  I've read your

9    papers.  Specifically, remind me of when the confirmation

10   was and when the time for revocation would expire but for

11   an extension.

12       MS. THOMPSON:   Thank you, Your Honor.  Your Honor,

13   just to set this in the appropriate context, and I know

14   that you are painfully aware, but so that the record is

15   thorough, this bankruptcy case went through a number of

16   trials and tribulations both before and after the

17   appointment of Larry S. Hyman as the Chapter 11 Trustee.

18   And a great part of the endeavors that he and his counsel

19   did in the case was to investigate and explore potential

20   causes of action that could be filed against Mirabilis,

21   Mr. Amodeo, and other related entities for actions that

22   have been taken both before and during the beginning of

23   this bankruptcy case and indeed the very filing of the

24   bankruptcy case.

25       Ultimately, Mr. Warren came in as counsel to Common

1    Paymaster and was able to orchestrate what we believe to

2    be an amicable and an appropriate business solution to

3    all of the litigation, which everyone agreed would have

4    been quite contentious, probably very ugly, and would

5    have been extensive in the context of the time required

6    as well as the expense.

7          And having an opportunity to ensure that creditors

8    got paid appropriately and carving a mechanism by which

9    Mirabilis, the Reorganized Debtor, and the Disbursing

10   Agent all fulfilled roles in a fiduciary or quasi-

11   fiduciary capacity to ensure that all of the competing

12   interests in the bankruptcy case were addressed in the

13   consummation of the Bankruptcy Plan, we were able to

14   reach resolution of all of what we believed to be and

15   understood to be pending issues that were or could have

16   been raised in the bankruptcy case, many of which,

17   therefore, were never brought before Your Honor, never

18   aired in this Court, never adjudicated, and were

19   amicably settled with a Confirmed Plan and related

20   releases that released both the Debtor, the Reorganized

21   Debtor, Mirabilis, all of its related entities as well as

22   its employees, but did not release Mr. Hyman other than

23   as between the co-proponents of the Plan.

24         The Plan provided that Mr. Hyman in concert with

25   Mirabilis and/or the Reorganized Debtor was to review the

claims and make distributions and determine what
objections to claims were appropriate. And we did that
for some time. And in fact, the Plan was funded with
monies that were contributed by Mirabilis in return for
receiving an interest in the Reorganized Debtor, an
ownership interest, and the allowance of claims that were
predicated on the payment of payroll from Mirabilis and
Common Paymaster prepetition.

Those claims were allowed, and the Plan was
confirmed. And the supplemental funding that needed to
be included with the new capital was calculated with the
participation -- active participation of all of the co-
proponents addressing the claims as we knew them to be in
the case and the objections as we believed them to be
filed, the administrative claims that would be likely
through confirmation as well as the administrative
expenses to perform the Disbursing Agent's duties post-
confirmation. And we determined that 1.344 -- $1,344,000
would be an adequate amount of money based on our best
estimates and based on the information that we had
provided to us or that we knew from our own personal
knowledge.

Post-confirmation, things tracked for a while, and
we were making good progress, and we were working
amicably together. And then sometime in January of 2007,

1    we learned that Common Paymaster, a co-proponent of the

2    Plan and the party that was responsible for making all of

3    the taxes and trust fund distributions as well as payment

4    of insurance and other benefits to employees of the

5    Debtor or individuals who were performing services on

6    behalf of the Debtor, had closed its doors.

7        Initially, informal approaches were made to

8    question what was being done and to confirm that payments

9    had been made appropriately, both during the pendency of

10   the case, both before and after Mr. Hyman was appointed

11   as the Chapter 11 Trustee.  On January 30th, 2007, we

12   sent a letter directed to Mr. Lash, who was the person

13   that we were working with in post-confirmation matters,

14   requesting information regarding Common Paymaster's

15   compliance with all trust-fund employee-related

16   obligations during the pendency of the reorganization.

17   That letter was forwarded to Mr. Warren.

18       On February 11th, 2007, we sent a follow-up letter

19   to Mr. Warren making the same or similar request.  On

20   February 15th, 2007 -- we learned last night in reviewing

21   tax returns that were made available to us for the first

22   time that Mr. Flynn, former and perhaps current chairman

23   of Mirabilis and a defendant in a lawsuit that was filed

24   against Paymaster and him individually yesterday and as

25   president of Common Paymaster, had executed a tax return

1      for the fourth quarter.

2          And we also learned on Tuesday -- Monday night that

3      that tax return had a deficit of $2.9 million in monies

4      that should have been remitted to the government and had

5      not been.  And that there was going to be and that there

6      had been correspondence to the IRS and a meeting

7      requesting that a credit of an associated Mirabilis

8      company, AEM, Incorporated, another payroll company that

9      was in the newspaper yesterday as having sold its assets

10     and been subpoenaed in a grand jury investigation that is

11     ongoing against Frank Amodeo, Mirabilis, and other

12     related entities, had executed that tax return.

13         On February 16th, we received correspondence from

14     Mr. Warren advising that Common Paymaster had paid all of

15     its tax obligations for the first three quarters and that

16     -- in fairness to Mr. Warren all of the information that

17     he's provided to us has been provided to him from

18     individuals at Common Paymaster.  And I don't believe

19     that he has personal knowledge, and is representing what

20     his understanding is based on what his former client is

21     telling him.

22         But he also advised that he was not aware of any

23     problems or circumstances that would cause a concern to

24     the Disbursing Agent.  On February 23rd, we sent

25     correspondence to Mr. Bernet, formerly counsel for Common

1    Paymaster, now general counsel to Mirabilis, asking for

2    verification of Common Paymaster's compliance with its

3    tax obligations, including actual proof of having filed

4    returns, and we attached an IRS form that would have

5    allowed us to confirm the filing of those returns. And

6    it's our understanding that as of February 23rd, 2007,

7    Mr. Flynn would have still been president of Common

8    Paymaster and been able to execute those requests in that

9    capacity.

10       Prior to Mr. Lash's withdrawal, he and I had

11   agreed, following the publication of a newspaper article

12   on March 3rd that advised that Mirabilis and Mr. Amodeo

13   and related entities were under a criminal grand jury

14   investigation for activities that were associated with

15   the failure to remit appropriate payments for tax

16   obligations, that under those circumstances and until we

17   could confirm whether those payments had been made on

18   behalf of the Debtor, that it would be appropriate to not

19   make distributions in this case.

20       On March 6th, 2007, we received correspondence from

21   Mr. Warren, who is replacing and substituting for Mr.

22   Lash in all activities related to post-confirmation,

23   purporting to act in a quasi-fiduciary manner to direct

24   the activities of the Disbursing Agent and asking and

25   authorizing Mr. Hyman to make immediate distributions in

1  the face of an unresolved issue with his former client

2  regarding whether tax payments were made.

3  On March 7th, 2006 (sic), we received

4  correspondence from Mr. Warren stating he was at a loss

5  as to why we had either standing or any need to verify

6  that Common Paymaster had satisfied its obligations.

7  However, he did offer to allow Mr. Hyman to go to the

8  business premises of Common Paymaster and review employee

9  records, not payment records mind you, but employee

10  records.  However, Mr. Hyman was specifically told that

11  he could not do that with counsel.

12  Having not been able to achieve in a private and in

13  a what we felt was a very reasonable and very patient

14  manner answers to questions that were very troubling to

15  us, particularly in the context of an article that -- in

16  which there are folks who are confirming that there is a

17  grand jury criminal investigation being advised by the

18  U.S. Trustee, that Mr. Hyman, in his fiduciary capacity

19  formerly as a Chapter 11 Trustee and now in the

20  Disbursing Agent -- as a Disbursing Agent, should be

21  confirming that tax payments are being made.

22  And in the face of the correspondence and

23  communications from the folks who could confirm that

24  without actually confirming anything and telling us not

25  to worry, we were, quite frankly, at a loss as to how to

1       proceed in an appropriate manner that would best protect

2       the business judgment -- the business result that had

3       been achieved through the confirmation, of which we are

4       all very proud and were very pleased, without creating

5       potential future issues not only for Mr. Hyman but also

6       for the Debtor and for creditors of the estate.

7              And so we did file our motion to extend the time to

8       seek revocation of a Confirmed Plan in the hopes that --

9       and seeking alternative relief from the Court in the

10      hopes that we could fashion and cattle together some form

11      and some mechanism by which the Debtor and this

12      Reorganized Debtor, the Disbursing Agent, formerly the

13      Chapter 11 Trustee, and all creditors could be

14      comfortable that whatever bullets are flying in whatever

15      other courts or in what other agencies in this country,

16      that none of them are going to be aimed at us.

17             And the motion was filed on March 13th.  And on

18      Monday for the first time, for the very first time, we

19      were advised that we -- that Mr. Warren had some

20      documents that had been provided to him from Common

21      Paymaster, that those documents were available.  At first

22      he said that Mr. Hyman had to come by himself.  However,

23      he did allow me to accompany Mr. Hyman, and Mr. Hyman and

24      I went to that location yesterday.

25             And Mr. Warren and his partner Mr. Jenkins afforded

1      every professional courtesy that one might expect from

2      such a fine law firm. And we were -- they were patient

3      with the questions that we asked, and they -- and they

4      were diligent in following up on things that they could

5      follow up on.

6      And we were shown -- first of all, we were shown

7      quarterly returns that were purportedly filed. However,

8      we were told that at this juncture, there would be no way

9      to verify that those returns had been filed because there

10     was no longer any individual at Common Paymaster who

11     would have the capability of making a request for a

12     transcript to verify that those returns that we have been

13     shown are the actual returns that have been filed with

14     the government.

15     We were provided payment information that came from

16     the government site that reflected payments as they were

17     made on behalf of Common Paymaster and its EIN number.

18     And those payments had been reduced to an Excel

19     spreadsheet. When Mr. Hyman expressed his misgivings

20     that that spreadsheet was susceptible to manipulation and

21     we could not tell the origin of that, they immediately

22     worked with Mr. Flynn and obtained the actual printout.

23     And they allowed Mr. Hyman and I to stay in those

24     premises even after they left, which we appreciated

25     greatly, so that we could painstakingly go through each

1    and every entry to confirm that those payments on the

2    chart that they had given us were identical to the

3    payments reflected by the document that had been provided

4    through the government printout, and that they matched

5    the numbers that were on the returns that we don't know

6    have been filed but have been provided to us.

7         And we did that, and we were able to determine,

8    with the exception of the $2.9 million issue for the

9    fourth quarter, that all of those payments are reflected

10   with those government -- those government documents.

11   However, we were not allowed to take any of them with us

12   to copy them.

13        In addition, the third issue that we had was to

14   confirm that the reports -- the returns, if they were

15   filed in the form that they were provided to us -- and we

16   have no way to know one way or another, or no reason to

17   believe one way or another that they weren't -- whether

18   those returns were accurate and comprehensively listed

19   all of the employees that Common Paymaster had during

20   that appropriate applicable period.

21        And we were provided in that context with what were

22   spreadsheets that came from some software that listed by

23   social security number each and every employee that --

24   with a number that matched the number, although we did

25   not count to see if there were 1700 employees, or

1   whatever the number was, I will say, but those were

2   there. And all of those employees were listed and the

3   numbers matched the numbers on the returns and the

4   numbers matched the numbers on the payment history with

5   the exception of the $2.9 million. In other words, it

6   was all consistent. There is no doubt that there is a

7   $2.9 million issue for the fourth quarter.

8        But for the first three quarters, it all seemed to

9   work together. We were under considerable pressure from

10  the Reorganized Debtor to make an immediate decision to

11  drop and withdraw our motion that we had filed here today

12  and to take this hearing off. And we expressed

13  misgivings because, although we felt that we had in two

14  days achieved more than we had achieved in the four

15  months prior that we had been asking these questions, we

16  still did not feel that we had enough information that

17  Larry could determine there was no issue -- we knew there

18  was an issue with the fourth quarter, but we could not

19  determine with the other three quarters whether we had

20  sufficient information, whether those documents were

21  authentic, accurate documents.

22       We requested -- we asked whether there could be an

23  affidavit that would authenticate those business records

24  and represent -- make a representation that those records

25  had been taken from the Common Paymaster books and

1    records and that they were accurate and complete, that

2    somebody could sign off on. And we were told, first,

3    that there was no one that could do that, and second, in

4    the context of a criminal investigation, that it was

5    unlikely that anyone would be advised by their attorney

6    to be corroborating anything.

7         And although we can well understand those

8    misgivings and those sentiments, I think it squarely

9    shows the concerns that we have here because we are being

10   asked to take on faith from folks that aren't willing to

11   provide in a manner that we can keep, retain for our

12   records and use if there should be any future issue as a

13   reasonable defense, documents that would insulate the

14   Reorganized Debtor, the Debtor, or the Chapter 11

15   Trustee.

16        We have, Your Honor, more extensively reviewed all

17   of the law. And quite frankly, the motion was filed more

18   as an incentive to try and reach a somewhat amicable

19   conclusion, and perhaps with the help of the Court, to an

20   issue that we were unable to address through our private

21   correspondence between the parties. But having now

22   reviewed the law, it appears that there is very little

23   discretion that the Court has to extend the deadline to

24   file a complaint.

25        The deadline, Your Honor, you asked, is April 23rd,

1    2006 (sic), which is imminent.  And although we feel more

2    comfortable today than we did last week, and we felt more

3    comfortable when Mr. Warren came in and started working

4    with us in a good-faith effort to try and address these

5    problems -- although, for the record, I'd have to say

6    we've had some concerns based on his former

7    representation of Common Paymaster and the issues that

8    are developed between the reorganization and the -- the

9    Reorganized Debtor and Common Paymaster with respect to

10   this very obvious conflict.  But we were more comfortable

11   when he came onboard.

12        And at this moment in time, Your Honor, I think

13   we're going to agree to withdraw our motion.  And we are

14   going to -- so that the record is abundantly clear, we

15   are going to continue to try to work cooperatively with

16   the Reorganized Debtor and Common Paymaster to get the

17   documents in a position where we feel that there is no

18   liability for the Debtor -- for the Reorganized Debtor.

19   There's no issues with respect to representations that

20   have been made to the Court.  And Mr. Hyman most

21   especially, from our perspective, is completely -- in a

22   completely -- able to defend himself completely in any

23   future issues.  So we are going to withdraw that motion.

24        However, we, at this moment in time, if we're not

25   able to address those issues in a manner that we are

completely comfortable with, we will be filing a complaint seeking to revoke confirmation and for other related relief. And perhaps we can, through that mechanism, continue to obtain the information that we need to have.

But this motion -- and I just want to say again, we consider this to be the lesser of two evils, and we tried to not be precipitant, we tried to not make and prejudge anything and to afford every opportunity for documents to be produced that would satisfy our concerns.

And one other thing for the record. I think that there's been -- there is an issue out there that no one really knows the answer to, and we're certainly not going to be asking the Court to determine it. But it is an issue that does impact on what is going on here, and that is, whether or not there are any employees of the Debtor and whether or not the Debtor has any obligations to the taxpayer.

Of course when you get tangled up with the IRS, generally they have a lot of presumptions and you have to defend, and that can be a very expensive process no matter how sure you are of the ultimate outcome. And no one who is on this side of the bench can be that sure.

But the Schedules were filed, and they were replete with names of employees of the Debtor who had claims

1    against this estate.  Mirabilis filed a claim for payroll

2    for payment of employees of the Debtor that constitutes

3    and comprises the basis for the claim that was allowed in

4    a very significant amount.  The case management summary

5    that was filed states that there were 60 employees of the

6    Debtor.

7         And so although we're not sure that that is -- any

8    of that is necessarily true, there have been some

9    statements that have been made in correspondence that

10   Your Honor may have reviewed in advance of this hearing

11   that suggests that there's no issue because there are no

12   employees.  And I think that that's a very -- a very

13   attractive and certainly, were that true, would be very,

14   very pleasing for us.  But I think that it is not

15   necessarily true.  And I think that we need to be mindful

16   that that issue is not a determined issue.  Thank you,

17   Your Honor.

18        THE COURT:  All right, Mr. Warren, you don't need

19   to respond, but I have read your response.  And it looks

20   like Miss Thompson concedes the merits of your response

21   anyway.  But I have a question about the financial

22   reports.

23        MR. WARREN:  Yes, Your Honor.

24        THE COURT:  What did Mr. Hyman use to ascertain the

25   accuracy of those reports if Mr. Hyman didn't have the

1   backup on the withholding?

2       MR. WARREN: Your Honor, Mr. Hyman has always had

3   in his possession, care, custody and control whatever

4   payroll records he would have had regarding the time that

5   he served as the Chapter 11 Trustee. I've never seen

6   those records. I don't know what those records

7   contained. But I -- presumably, he has those records,

8   which is one of the reasons, Your Honor, why there's been

9   such an incredulous view on my client's position, the

10  Reorganized Debtor's position, as to why we have this

11  controversy, because Mr. Hyman should have in his records

12  all those matters.

13      What Miss Thompson has shared with me has been

14  their concern has been that although Mr. Hyman's records

15  would reflect the transfers of funds to Common Paymaster,

16  and the record would also reflect that the employees were

17  not directly employed by the Reorganized -- by the Debtor

18  during the Chapter 11 case --

19      THE COURT: They were leased employees?

20      MR. WARREN: Well, they weren't leased, but an

21  argument could be made that they were or that there was

22  some responsibility. And therefore the payment issue

23  became somewhat of a contentious concern to Mr. Hyman.

24  So what we set about doing was to try to eliminate and

25  alleviate those concerns.

1    The problem, Your Honor, is, is that during 2006,

2    Common Paymaster, as its name implies, was a little "c"

3    common little "p" paymaster, meaning that it provided

4    payroll filings on behalf of a large number of employees

5    of a large number of related entities. And so

6    consequently during the year 2006, the returns that we

7    have copies of -- I can't say they were filed because I'm

8    not the IRS and there's no way I can verify they were

9    filed. But I've given Mr. Hyman and his counsel copies.

10   And those were available a very long period of time,

11   showed approximately $13 million worth of payments made

12   -- you know, to be made to the government because there's

13   just a significant number of employees.

14   Today the Reorganized Debtor has I think 25

15   employees, you know, so there's a very, very small

16   segment of what was being filed and reported by Common

17   Paymaster. So that in terms of identifying any

18   information, you know, the 941s and the 940s don't

19   reflect all the detailed information. So it is not an

20   easy task to go at this from the Common Paymaster side,

21   but it is a very easy task to come at it from Mr. Hyman's

22   side.

23   And, you know, it's not -- it's our understanding,

24   you know, that although there could be some argument that

25   even though payments were made to Common Paymaster and

1    Common Paymaster didn't pay the government, that there

2    could be some liability. Our position has been from day

3    one that these are issues for the Reorganized Debtor.

4    These are not issues for the Disbursing Agent to raise,

5    and they're not issues for the former Chapter 11 Trustee

6    to raise, particularly in the context of revocation of an

7    order confirming a Plan, because there's only one ground

8    upon which that revocation can be based, and that's fraud

9    on the Court.

10   And so someone like me has bristled from day one

11   with this assertion that there was a fraud on the Court

12   in this Confirmation Order, you know, with respect to

13   there's any suggestion that that could have occurred

14   because it did not occur. It didn't occur by Mr. Hyman

15   as the Chapter 11 Trustee. It didn't occur by Mirabilis.

16   It didn't occur by Common Paymaster.

17   This was a very simple Plan, Your Honor will

18   remember. We settled all the disputes and exchanged

19   releases. Mr. Hyman was a party to the same release that

20   everybody was a party to. And then we funded the Plan

21   with $1,388,000 cold cash, as Mr. Anthony would say,

22   "from Mr. Green," which is there to do only one thing:

23   to pay the allowed claimants in this case.

24   There was no other representation about future

25   conduct. No other representation with respect to any

1   aspect of what would be done under the Plan.  So

2   consequently, the suggestion that 1144 is implicated here

3   was more than irritating.

4   And I will state for the record that I've already

5   purposed in my heart that I'm going to write Miss

6   Thompson a note because I need to apologize to her

7   because I've lost my temper twice in conversations with

8   Miss Thompson with respect to this matter.  And I don't

9   usually lose my temper, but I have because I have found

10  it very offensive to me personally as a Chapter 11

11  practitioner that anyone would suggest that there would

12  be a revocation of a Confirmation Order in this case

13  where the facts are plain and clear.

14  Now there is no question, Your Honor, that in the

15  broader scheme of things, the Mirabilis Ventures entity,

16  its affiliates, including the former clients of Gray

17  Robinson -- you know, that there was an initial

18  controversy that brought me into this case was dealing

19  with those issues.  There are -- there are lots of

20  problems associated with those entities.  I don't know

21  what they really are, but I've been told that they are

22  significant, and I've been told that they are being dealt

23  with in an appropriate fashion.

24  My job on behalf of the Reorganized Debtor is to

25  protect the 25 jobs of the people who are working in that

1    organization and who are continuing to work in that

2    organization. And when someone makes the suggestion that

3    there's going to be a revocation of confirmation, that

4    puts a cloud over the Reorganized Debtor and its ongoing

5    business operations. And that's why Congress enacted

6    1144 and didn't create discretion to extend the time to

7    revoke confirmation because there has to be finality with

8    respect to those issues.

9         But the mere suggestion that there was a fraud on

10   this Court just bristled me. It bristles me now as I'm

11   standing before this Court because nothing could be

12   further from the truth, particularly when you look at it

13   from Mr. Hyman's perspective, because this Plan was filed

14   in September, which is the third quarter. There are no

15   tax issues at any level, under any circumstance in the

16   third quarter of 2006 with respect to Common Paymaster.

17        When this Plan became effective was in November.

18   There's no pay period in November for which Mr. Hyman

19   would have any exposure under any circumstance. And it's

20   pretty clear from the payment history that we showed --

21        THE COURT: Not October?

22        MR. WARREN: October's were paid. And so there is

23   a question whether a credit was applicable for Common

24   Paymaster's last, you know, two months of 2006. And I'm

25   not -- that's not anything I'm involved with or

1     responsible for. But the numbers, you know, suggested

2     there is no exposure to Mr. Hyman. I have told time and

3     time again that Mr. Hyman not only is a colleague, he is

4     a client of my law firm in other matters. He is a very

5     dear friend, and, therefore, there is nothing that I

6     would do as an advocate that would put him in a position

7     of being in harm's way.

8     But what's been so irritating has been the

9     suggestion that there should be a revocation of

10     confirmation in this case because there was a fraud on

11     the Court. That harms the Reorganized Debtor. It

12     interferes with its business operations. It affects the

13     employees. It affects the morale of that organization.

14     And there's no foundation for it, Your Honor, meaning,

15     that at the end of the day -- if you read this motion,

16     you're reading a motion that attaches to it a newspaper

17     article.

18     There's a fine representative of the *Orlando*

19     *Sentinel* here today, you know. That newspaper article

20     doesn't even mention Common Paymaster. Does not even

21     mention Common Paymaster, you know. So where's the

22     predicate for this motion to have been filed?

23     You know, there are issues with respect to

24     obtaining information from Common Paymaster that just

25     occur when a company stops operating and no longer has

1     people to sign affidavits or to sign -- you know. You

2     know, I've actually talked to Mr. Bernet about trying to

3     go another mile, having felt like we've gone mile after

4     mile after mile to satisfy these concerns that Mr. Hyman

5     has.

6     But what I've said, and I say on the record here,

7     my client is the entity that's on the hook with respect

8     to any fourth quarter obligations because it's the

9     Reorganized Debtor. And to the extent that there is a

10    claim that gets made, it hasn't been asserted yet. You

11    know, if a claim gets made, we're the ones that first

12    have to deal with it.

13    And we don't think there's any liability under any

14    circumstance because these people were not employees of

15    Community Health Solutions of America, LLC. But

16    arguably, if they were, you know, our proof of payment is

17    pretty convincing and pretty clear. And we think that

18    will end the discussion.

19    So let's stop the harm to the Reorganized Debtor.

20    Let's stop suggesting to this Court there was anything

21    improper with respect to this confirmed Plan. I sort of

22    feel like a Northerner, you know, in reconstruction days.

23    You know, we had a war; we settled the war; it's over

24    with. But somebody keeps wanting to snip and snap and

25    fight over things that occurred with respect to the

1    matter.

2         And it's -- and there's no predicate.  I mean, if

3    you read the motion that's now been withdrawn, you know,

4    it's inference, it's innuendo, it's speculation.  You

5    know, it's the same stuff that's had my wife in a fit all

6    day long because of Donovan leaving Florida to go to

7    Kentucky only to find out that Donovan's not leaving

8    Florida to go to Kentucky.  It's all been speculation,

9    not based upon fact.  And so consequently, you know,

10   that's very harmful to the Reorganized Debtor and its

11   business organization.

12        And I appreciate Miss Thompson's, you know,

13   suggesting, you know -- you know, withdrawal of her

14   motion, you know.  You know, we pointed out on the very,

15   very first minute that the Court had no authority to

16   extend this deadline.  And, you know, our response

17   contains, you know, the recitation with respect to that.

18   It's a very clear statutory predicate that cannot be

19   extended.  And Rule 9024 makes it clear that you defer to

20   the statute.  And even with *Marrama*, the recent Supreme

21   Court case that talked about the court's expanded 105

22   powers, you just don't get there.

23        So I apologize, Your Honor.  I just have been so --

24        THE COURT:  I think that if Miss Thompson knew she

25   was going to withdraw the motion, she probably should

1   have told me that up front.  But she didn't.  She wanted

2   to make a record in front of this newspaper reporter,

3   perhaps, or a record for the Court.  I felt like I had to

4   accord you equal time.

5           MR. WARREN:  Thank you, Your Honor.

6           THE COURT:  I still have some questions.

7           MR. WARREN:  Oh, yes, Your Honor.

8           THE COURT:  The last board of directors for Common

9   Paymaster, not a single one of those persons may be found

10  to sign a release?

11          MR. WARREN:  Your Honor, Mr. Bernet is their --

12  Mr. Bernet is their -- is the general counsel for

13  Mirabilis.  Mr. Flynn, who we reached out to last night,

14  who provided to us the past Word information in order for

15  us to go, you know -- so Miss Thompson and Mr. Hyman

16  would not have to rely upon copies or a spreadsheet.  We

17  could go, and did -- Mr. Jenkins went and actually pulled

18  it off, you know, directly, having the information Mr.

19  Flynn gave to us.  He's resigned, you know.  But he might

20  be available to assist.  I mean, again --

21          THE COURT:  No.  That's not my question.  When a

22  company --

23          MR. WARREN:  It's not dissolved, Your Honor.  The

24  company's not dissolved.

25          THE COURT:  Right.  Oh, okay.  Well, then --

1          MR. WARREN:  It's just not operating.

2          THE COURT:  But there has to be somebody.  Even if

3     there's not an officer, there's still a board of

4     directors.

5          MR. WARREN:  If they haven't all resigned, Your

6     Honor.  And I can't comment.  I don't -- my role on

7     Common Paymaster was -- ended when the -- you know, on

8     the effective date of the Plan.  I haven't -- I don't

9     have any other issues with, you know, with --

10          THE COURT:  All right.  Next question:  Does the

11     IRS sit for Rule 2004 exams, for basic exams that ask for

12     production of documents to show whether payments were

13     made and what kind of payments were made?

14          MR. WARREN:  I never had the nerve to think about

15     doing that, Your Honor.

16          MS. THOMPSON:  Your Honor, I understand, because

17     we've -- we had extensive discussions with the IRS.  And

18     if Mr. Warren is bristling because he's here today, I'm

19     bristling because we sent letters in January.  And if it

20     was so clear and so sure, then we could have been

21     provided information then.

22          THE COURT:  But my point is we've got cases --

23          MS. THOMPSON:  But the --

24          THE COURT:  Wait.  We've got cases coming after

25     here.  And we've spent a long time on a motion that I'm

1     not even allowed to determine because it's been

2     withdrawn.  And these other counsel are here from out of

3     town.  And we've spent a lot of air time making a case

4     for some unknown reason.  Now, I understand Mr. Warren

5     was trying to do a brush back pitch for you.  I cannot

6     make her not file a complaint.

7          MR. WARREN:  No, Your Honor.  She can certainly --

8          THE COURT:  The deadline is the deadline.

9          MR. WARREN:  She can certainly file a complaint,

10    and we can certainly pursue whatever remedies.  With

11    respect -- with respect to the fundamental question, Your

12    Honor, I did ask Mr. Bernet if there was some way we

13    could get somebody to give us a power of attorney on

14    behalf of CPC so that we could eliminate the concern

15    about what was actually given to the IRS, meaning, we

16    have the signed copies but we don't have anything

17    confirming that this was actually what the IRS received.

18         I am -- I will work with Miss Thompson to try to

19    get that.  Mr. Bernet felt like we ought to be able to

20    accomplish that if given a little bit of time.

21         THE COURT:  All right.  There's authority out there

22    that says postconfirmation I can order a 2004 exam,

23    particularly at the request of a Distribution Trustee who

24    needs to get audit records.

25         MR. WARREN:  I think all we have to do is get --

1    THE COURT: That's the same thing.

2    MR. WARREN: It's a non-debtor entity, so all we

3    have -- I think we have to do is to find someone in a

4    position who has authority to act on behalf of the non-

5    debtor to authorize us to get it. Mr. Hyman and Miss

6    Thompson called it a transcript. I guess that's the

7    proper phrase.

8    THE COURT: That is. Okay. All right, Miss

9    Thompson, go ahead and give me an order denying --

10    reflecting the fact that the -- that Mr. Hyman chose not

11    to advance the motion in recognition of the rule that was

12    cited in Mr. Warren's response --

13    MS. THOMPSON: And the progress that had been made.

14    THE COURT: And the progress that had been made,

15    that's true -- and therefore, I'm going to deny the

16    motion as moot. I will say this, though: This motion,

17    there was one paragraph in here that I think that your

18    firm really needs to watch out what it puts on paper.

19    Paragraph 13 says that I prevailed upon Mr. Hyman

20    and his counsel not to initiate an adversary proceeding

21    or seek a recovery through litigation. That is not what

22    those transcripts show. That same paragraph says: The

23    Court even persuaded Hyman to refrain from conducting any

24    discovery while efforts were being made, et cetera, et

25    cetera.

1          That is not what the transcript shows. The

2     transcript shows that someone stood up and made what

3     would be the equivalent of an ore tenus motion. It was

4     vetted, and it was agreed to. I did not lean on anybody.

5     I don't -- I make rulings on motions. I don't tell

6     people how to run their case. And I do not appreciate

7     those kinds of sentiments being put into a motion. And

8     I'm going to -- from now on, I'm going to request

9     transcripts of everything that occurs so I can make sure

10     that nothing is in a motion that is inaccurate.

11          All right. Now, we have a second motion.

12          MR. WARREN: Yes, Your Honor. And --

13          THE COURT: And this is just preliminary because it

14     was short notice.

15          MR. WARREN: I do understand. However, we have

16     been asking for this for many months, and we have

17     provided the information that would demonstrate that

18     under this Plan, you know, that there are creditors whose

19     claims are allowed, and the Disbursing Agent has not made

20     payments to those creditors after having made payments

21     to, you know, the law firm and himself and Mr. Simmons,

22     and having disbursed that money.

23          But there is in excess of $568,000, Your Honor,

24     that remains in the Disbursing Agent's fund. And many of

25     these individuals are former employees who, you know,

whose sums are not particularly large amounts. But yet, you know, a $500 check to somebody could mean an awful lot to somebody who's -- you know, with respect to their compensation.

THE COURT: How many claimants are due a thousand dollars or less, does anybody know?

MR. WARREN: I can't -- we broke it down in the -- by Schedules, Your Honor. And there's an aggregate that -- well, let me walk through the aggregate numbers, Your Honor. There's $252,184.58 in claims that should be paid. And there is another $37,513.06 in claims that were filed seeking administrative treatment after the administrative claims bar date.

But even if you took those numbers together, you'd still have $279,000 in excess funds after paying all of the claims that have been allowed. And the bar date for objecting to claims has now passed, so consequently these claims have been allowed by virtue of order of this Court or by virtue of the passage of time.

There are -- there are $165,000 in disputed claims that are still outstanding that have not been resolved. So under the worst-case scenario, the disbursing agent has an excess of $113,879.87.

THE COURT: What's the potential maximum of a tax claim if one exists?

1    MR. WARREN:  We calculated, Your Honor, that during

2    the Chapter 11 case, the maximum tax obligation was

3    $37,000.  Now, Mr. Jenkins who is a lot smarter than I am

4    has also looked at it more carefully and would say that

5    it's actually zero because of the payments that were made

6    in October.

7         THE COURT:  How does Mr. Hyman calculate it?

8    What's the maximum do you think, Mr. Hyman?  You're

9    worried about your personal exposure from the IRS.

10        MS. THOMPSON:  Well, Your Honor, if I could, it's

11   not just that.  There are other issues with this motion.

12        THE COURT:  I'm not going to rule today, but I --

13   if there are little people out there that need their

14   paychecks or some amount because it was a pre-petition

15   pay period that didn't get paid, I don't know why you

16   can't disburse those.

17        MS. THOMPSON:  And, Your Honor, the Plan doesn't

18   have a mechanism by which we get to make distributions to

19   some unsecured claims and not others.  And there are

20   little people out there.

21        THE COURT:  Okay.  Wait --

22        MS. THOMPSON:  For example --

23        THE COURT:  -- wait, wait.

24        MS. THOMPSON:  -- Your Honor --

25        THE COURT:  Wait.  You're telling me, then, that

1    every single claim has to be resolved through litigation

2    in this court before you can fund a dime?

3         MS. THOMPSON:  The Plan says that there is a

4    distribution date, which is a date that Mr. Hyman selects

5    as a reasonable date.  And then -- and that date you

6    could, if there are disputed claims, those can be paid on

7    the date that they're allowed.  But any other claim, you

8    pay them all together.  And so we can't pay just --

9         THE COURT:  Well, on a date that he's -- basically

10   you're saying he can pay some in advance of others but

11   it's based on when he picks a date.

12        MS. THOMPSON:  It's the date.  And then he has to

13   pay anything that has been allowed on that date, and

14   that's been our concern.  And, Your Honor, speaking of

15   the little people, one of the questions we've raised with

16   the Reorganized Debtor and Common Paymaster is the

17   closing of Common Paymaster, whether or not trust --

18   other trust things were paid.  For example, 401(k)

19   contributions, whether insurance premiums -- we're told

20   that there are people with Cobra issues that haven't been

21   addressed.

22        We found out about tax claims for Kentucky -- state

23   of Kentucky that have been assessed.  The thing we've

24   most focused on because it's the --

25        THE COURT:  Does that relate -- wait a minute.

1            MR. WARREN:  Your Honor --

2            THE COURT:  Does that relate to the Debtor that I

3       had in this court?

4            MS. THOMPSON:  Yes, Your Honor.

5            THE COURT:  And was the state of Kentucky noticed?

6            MS. THOMPSON:  No, they were not.  And so that's an

7       issue out there that we don't know.  It may not be a lot.

8       We talked about it with Mr. Warren, and he's getting

9       information.  But that's an unknown quantity.  Folks that

10      had Cobra that lost it who were employees may have claims

11      that have not been paid and that would be claims that

12      could be asserted against the estate because I would

13      suspect that they haven't been given adequate notice in

14      this case to file claims for those kinds of things.  So

15      there are issues here --

16           MR. WARREN:  No --

17           THE COURT:  Why weren't those issues --

18           MR. WARREN:  -- no, no, no.  That is --

19           THE COURT:  Wait.  Why weren't those issues raised

20      pre-confirmation?  If you knew you had employees and you

21      knew that the employees were being reduced and there

22      might be Cobra liabilities --

23           MR. WARREN:  Those are all bogus, Your Honor.

24           MS. THOMPSON:  They were being paid by Common

25      Paymaster, Your Honor.

1    THE COURT:  I'm going to continue this particular

2    hearing and -- for a short time.  It will be the first

3    available Chapter 11 day after April 23rd.

4    MR. WARREN:  Your Honor, one moment.  Miss Thompson

5    did not tell Your Honor what the Plan says with respect

6    to the distribution date.  The distribution date is very,

7    very clearly defined in Section 1.31 of the Plan.  And it

8    says:  Distribution date when used with respect to an

9    allowed claim means the date as determined by the

10   Disbursing Agent that is as soon as reasonably

11   practicable after the later of the effective date, which

12   was November 10th, or the first business day after the

13   date upon which the claim becomes allowed.

14   These claims were allowed months ago.  Some of them

15   were allowed weeks ago.

16   THE COURT:  All right.  I think we need to continue

17   this so she can respond exactly to that proposition.

18   What you read makes me think that there are different

19   disbursement dates for different claims based on when

20   they become allowed.

21   MR. WARREN:  That's right, because --

22   THE COURT:  Wait, wait.  We'll argue this at a

23   continued hearing after April the 23rd.  What do you

24   have, Miss Garcia?

25   COURTROOM DEPUTY:  May 17th.

1    THE COURT:  All right.  This will be -- is May 17th
2    bad?

3    MR. WARREN:  Well, it's bad in one respect, Your
4    Honor, and that is, is that innocent people are being
5    harmed by the Disbursing Agent's failing to comply with
6    the terms of the Plan.  It's a hundred-percent Plan.  If
7    there's a claim allowed beyond the amount of money that
8    the Disbursing Agent has, that's the Reorganized Debtor's
9    obligation.  The Disbursing Agent has -- this is not a
10   limited fund, you know, with respect to --

11   THE COURT:  So there's a mechanism in the Plan for
12   more funding?

13   MR. WARREN:  The mechanism in the Plan is every
14   allowed claim, meaning Your Honor allows a claim -- and
15   we're talking about unfiled claims now, almost five-and-
16   a-half months after confirmation, you know, that haven't
17   been filed.  Every claim is to be paid 100 percent of its
18   allowed claim.  That's the terms of the Plan.

19   And so consequently, for Mr. Hyman to be hoarding
20   $500,000 and not paying these claimants whose claims have
21   been allowed is a violation of the Plan terms.  And to
22   wait another 60 days for these creditors --

23   THE COURT:  Do you have something closer than May
24   17th but which is after April 23rd?

25   MR. WARREN:  We'll come back anytime, Your Honor.

1        MS. THOMPSON:  And, Your Honor, there's a big rush

2    for this, and our firm has been working and not -- and

3    Mr. Hyman under the Plan could have been paying us for

4    post-confirmation.  We've not made any distributions to

5    anyone because there are questions out there that we

6    don't have the answers to, that we don't have the access

7    to the information that the Reorganized Debtor and Common

8    Paymaster do.

9        THE COURT:  Let me just ask you this:  Are you

10   willing to put your money back in that you've been paid?

11   Is Mr. Mecca willing to put his money back in that he was

12   paid?  Is Mr. Hyman willing to put his money back in that

13   he's been paid?

14       MS. THOMPSON:  If revocation is the appropriate

15   thing, then that's what happens, Your Honor.

16       MR. WARREN:  But the --

17       THE COURT:  I understand.  We're going to have a

18   hearing date soon.  And I hope that I don't have to hear

19   that some person that's out there working doesn't have

20   the paycheck paid that forms the basis of a claim and

21   it's a modest amount relatively speaking to us, maybe

22   here aggregate, but it means a lot to them, I'll be

23   concerned about that when we have our hearing.  I don't

24   know why --

25       MR. WARREN:  Can we make the hearing an evidentiary

1    hearing, Your Honor, because I would like to have the --

2         THE COURT:  Yes.

3         MR. WARREN:  -- opportunity to present evidence as

4    to the positions that are being taken in this courtroom

5    by counsel for the Disbursing Agent?

6         THE COURT:  All right.  Miss Garcia?

7         COURTROOM DEPUTY:  April 24th.

8         MS. THOMPSON:  Your Honor, if we're going to have

9    an evidentiary hearing, it needs to be fair.  We need to

10   have an opportunity to address -- and it's a perfect

11   opportunity for us to address these issues that are out

12   there, but we're going to have to do discovery as well.

13   And we're not going to be able to do that in that limited

14   period of time.

15        MR. WARREN:  Discovery --

16        MS. THOMPSON:  May 17th is okay if we shorten

17   discovery.

18        THE COURT:  All right.  You want an evidentiary

19   hearing, it's got to be May 17th.  You want to have a

20   preliminary hearing, it will be April 24th.

21        MR. WARREN:  I definitely want to have a

22   preliminary on April 24th, but that's --

23        THE COURT:  Okay.  We'll continue this -- we'll

24   continue this to April the 24th at 9:30.  The clerk will

25   send out a notice of continued hearing, so nobody needs

1    to generate any paper on this one.  And we will block out

2    May 17th, whatever time that was -- do we have for a

3    final evidentiary hearing, Miss Garcia?

4            COURTROOM DEPUTY:  Two o'clock.

5            THE COURT:  All afternoon?

6            COURTROOM DEPUTY:  Yes.

7            THE COURT:  Okay.  We'll block that out.  If things

8    don't get resolved or can't be resolved on the 23rd -- I

9    mean the 24th, then we'll have that time available.

10           MS. THOMPSON:  And can we shorten discovery to 15

11   days, Your Honor?

12           THE COURT:  Yes, you may.

13           MR. WARREN:  You can shorten it to ten days.  I

14   mean, why don't we shorten it to ten days?

15           THE COURT:  Ten's fine with me.  All right.  Then

16   that is going to cause someone to generate a piece of

17   paper, Mr. Warren.

18           MS. THOMPSON:  Your Honor, we need 15 days.  We

19   have two trials that are coming up in ten days.

20           THE COURT:  Fifteen days then.

21           MS. THOMPSON:  And also --

22           THE COURT:  Mr. Warren, go ahead and give me an

23   order, then.  The clerk won't notice the continuation of

24   the preliminary hearing.  You'll do that in a separate

25   order that also specifies that we're shortening discovery

1 response times from 30 to 15.

2   MS. THOMPSON:  And, Your Honor, on April 24th Mr.

3 Hyman is scheduled to be out of the country, so he will

4 not -- on May 17th Mr. Hyman is not available.

5   MS. THOMPSON:  Well, I'm sure that he can give his

6 testimony by deposition, then.  And I'm going to -- I'll

7 take notice right now that he will not be available at

8 trial and therefore his deposition testimony will be

9 admissible.

10   MS. THOMPSON:  Thank you.

11   MR. WARREN:  Thank you, Your Honor.

12   THE COURT:  And put that in the order, too.

13   MR. WARREN:  Thank you, Your Honor.

14   THE COURT:  Thank you.  And you might want to tell

15 the reporter who Mr. Green is, but on your way out.

16   MR. WARREN:  Thank you, Your Honor.

17   THE COURT:  Thank you all.

18   (Hearing concluded at 2:30 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA   )

COUNTY OF HILLSBOROUGH )


   I, MARILYN L. TAYLOR , Official Court Reporter and Notary Public, do hereby certify:

   That the foregoing hearing was reported by me at that time and place therein designated; and that the foregoing pages were transcribed by me and constitute a true and correct copy of the stenomask report.

   I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of the parties, nor a relative or employee of such attorney or counsel, nor financially interested in the foregoing action.

   BE IT KNOWN that I shall not attest to the accuracy nor content of any other than the original transcription herein set forth, excepting copies that are made by me by whatever means, containing my original signature only.

   WITNESS my hand and seal this 16th day of April, 2007, in the City of Tampa, Hillsborough County, Florida.


*Marilyn L. Taylor*

    Marilyn L. Taylor, CVR
    Certified Verbatim Reporter
    Notary Commission No.DD593730
    Expires: October 25, 2010